Travis CARTER, Respondent,

v.

Jimmy WRIGHT, et al., Defendant,

World Missions, Inc., Appellant.

No. WD 52288.

Missouri Court of Appeals,
Western District.

May 13, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 1, 1997.

Application to Transfer Denied
Aug. 19, 1997.

Andrew H. McCue, Campbell, Holt & McCue, Kansas City, for appellant.

John E. Turner, Christopher P. Sweeny, Hanover & Turner, Kansas City, for respondent.

Before HANNA, P.J., and BRECKENRIDGE and ELLIS, JJ.

ELLIS, Judge.

On the afternoon of June 3, 1994, Jimmy W. Wright was driving a dump truck north on Highway 65 in Taney County en route to a dump site. His truck was filled with sheetrock from a construction site operated by World Missions, Inc. Upon reaching County Road 60, Wright turned left into the path of Travis and Doris Carter, who were driving a motor home southbound on Highway 65. The ensuing collision resulted in the death of Mrs. Carter and severe personal injury to Mr. Carter.

Mr. Carter filed suit against both Wright and World Missions in the Circuit Court of Jackson County for personal injury and wrongful death. On November 16, 1995, in accordance with a jury verdict, the trial court entered a judgment against Wright and World Missions, jointly and severally, for $1,273,000 plus costs.[1] This judgment was later remitted to $1,267,500 plus costs. World Missions brings two points on appeal.

■ In its first point, World Missions claims the trial court erred in entering its judgment because there was insufficient evidence to support a finding of vicarious liability under the doctrine of respondeat superior. Under that doctrine, an employer is liable for the damages attributable to the negligence of an employee or agent acting within the course and scope of employment or agency. *McHaffie v. Bunch*, 891 S.W.2d 822, 825 (Mo. banc 1995). "The test to determine if respondeat superior applies to a tort is whether the person sought to be charged as master had the *right or power to control and direct the physical conduct* of the other in the performance of the act." *Wilson v. St. Louis Area Council*, 845 S.W.2d 568, 570 (Mo.App. E.D.1992). Once the plaintiff has made a prima facie case of agency, the issue must be submitted to the jury. *Dean v. Young*, 396 S.W.2d 549, 558 (Mo.1965).

---

1. The judgment awarded $273,000 for personal injuries to Mr. Carter, $10,000 for property damages, and $1,000,000 for the death of Mrs. Carter. The property damages were later remitted to $4,500. The court also awarded costs.

■ World Missions claims that there was insufficient evidence to establish that Wright was its employee or agent rather than an independent contractor.[2] Although World Missions concedes that Wright was acting to serve the business interests of World Missions at the time of the accident, World Missions claims there was insufficient evidence that it controlled or had the right to control the physical conduct of Wright.

■ "Generally, the relationship of principal-agent or employer-employee is a question of fact to be determined by the jury when, from the evidence adduced on the question, there may be a fair difference of opinion as to the existence of the relationship." *Johnson v. Bi–State Dev. Agency,* 793 S.W.2d 864, 867 (Mo. banc 1990). This relationship becomes a question of law only when the material facts from which it is to be inferred are not in dispute and only one reasonable conclusion can be drawn from those facts. *Id.* "If there is uncertainty arising either from conflict in the testimony or because the undisputed facts may lead reasonable men to draw different conclusions as to whether the employee was such and acting in the scope and course of his employment, the question becomes not one of law but of fact to be settled by the jury." *Smoot v. Marks,* 564 S.W.2d 231, 236 (Mo.App. E.D.1978) (en banc). Since the issue here is whether a submissible case was made, we must review the facts in the light most favorable to Carter and give him the benefit of all reasonable inferences arising from the evidence, disregarding World Mission's evidence except where it favors Carter's case. *Id.* at 235.

Accordingly, the record, when reviewed in the prescribed light, reveals that World Missions is a Texas corporation which was founded in 1969 by C.B. Hollis to conduct missionary work. In the early 1990s, World Missions began selling off its foreign holdings. During that same period, David Hollis, the son of C.B. Hollis, became a vice president of World Missions and assumed an active role in its business.

On June 4, 1993, World Missions purchased Lot 13 in the Country Bluffs Estates subdivision near Branson, Missouri. Later that year, World Missions decided to use the balance of the proceeds from the sale of its foreign holdings to construct a parsonage/missionary retreat on that lot. David Hollis was appointed by World Missions to act as general contractor on the project. In August, 1993, Hollis traveled from his home in Texas to examine the lot. He brought Wright, an unemployed construction worker, with him. Hollis and Wright had been friends for about 35 years.

Later in the fall of 1993, Hollis and Wright returned to Branson with their respective mobile homes. Hollis and Wright set up their mobile homes next to each other on an empty lot and shared a phone line and electric service. Eventually, they also brought Wright's dump truck and a crawler up from Texas. Wright began doing construction work on Lot 13 and other lots in the subdivision. At some point, Wright presented a contract proposal to Hollis to install a reinforced concrete wall in the basement of the parsonage for $11,516. Hollis declined the offer and indicated that he preferred to pay Wright by the hour. Wright continued to do hourly work on Lot 13 whenever Hollis would schedule him to work. Wright's hourly wage would vary depending on the type of work and whether Wright was using his own equipment.

About May 26, 1994, Hollis needed to have some sheetrock removed from the Lot 13 construction site. Hollis investigated the cost of a dumpster service. Hollis and Wright discussed the possibility of using Wright's dump truck instead. The dump truck had remained parked in an empty lot since Wright had brought it to Missouri from Texas. Hollis determined that it would be cheaper to have Wright's dump truck licensed and to use it to haul the sheetrock. Hollis agreed to pay for Wright's license and

---

**2.** "An independent contractor is one who contracts with another to do something for him but is neither controlled by the other nor subject to the other's control with respect to his physical conduct in the performance of the undertaking."

*Lange Co. v. Cleaning by House Beautiful,* 793 S.W.2d 869, 871 (Mo.App. E.D.1990). A principal is generally not held responsible for the torts committed by an independent contractor. *Id.*

for the dump fees if Wright would use his truck to haul the sheetrock.

Wright then went to get a safety inspection of his truck. While trying to get the truck licensed, Wright discovered that he needed a tax clearance. Hollis explained to Wright how he could get that clearance by faxing information to the Missouri Department of Revenue.

Four or five days before the accident, Hollis and Wright loaded the sheetrock into the dump truck. Hollis made some calls to find out where he wanted Wright to dump the load. After making arrangements with a dump site, Hollis told Wright which dump site he was to use. Hollis and another worker in the subdivision gave Wright directions on how to get to the dump site. Since he had to go to Detroit, Hollis left a blank check with Wright to cover the licensing and dumping costs along with two other checks to pay some of the Lot 13 workers.

On the morning of June 3, 1994, Hollis told Wright over the phone to make sure the dump truck was completely full of sheetrock before going to the dump because he was paying a flat fee for the load. Wright's tax clearance had come through, so he was able to pick up the license plates for his dump truck. When he returned from picking up the plates, Wright finished loading the dump truck and left for the dump site.

After the accident, Hollis approached Wright and told him that if anyone asked him about the accident to tell them that he was hauling the sheetrock for another general contractor in the subdivision named Nino.

■ "Whether a party is liable under the doctrine of respondeat superior depends on the facts and circumstances in evidence in each particular case and no single test is conclusive of the issue of the party's interest in the activity and his right of control." *Wilson v. St. Louis Area Council*, 845 S.W.2d 568, 571 (Mo.App. E.D.1992). The Restatement (Second) of Agency § 220(2) (1958), lists the following factors to aid in "determining whether one acting for another is a servant or independent contractor:"

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of operation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by time or by the job;

(h) whether or not the work is part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business.

*Ferguson v. Pony Express Courier Corp.*, 898 S.W.2d 128, 132 (Mo.App. W.D.1995). None of these elements alone is conclusive, and all must be viewed to see whether control, or the right to control, has been retained over the alleged servant's physical conduct and the details of the work. *Cloninger v. Wolfe*, 477 S.W.2d 440, 443 (Mo.App. S.D.1972). "The determining factor is not whether respondent actually exercised control over the work ... but whether respondent had the *right* to exercise that control." *Pratt v. Reed & Brown Hauling Co.*, 361 S.W.2d 57, 63 (Mo.App. W.D.1962) (emphasis in original).

When the foregoing factors are considered in light of the facts of the case at bar, it is readily apparent that Mr. Carter made a prima facie case of agency. First, the evidence supports a conclusion that Hollis retained the right to control the details of the work. In all previous instances where Wright worked for Hollis, Wright was paid by the hour. When Wright tried to get

Hollis to contract with him, Hollis declined, indicating that he wanted to retain control over the work done for him. Wright testified that, when working for Hollis, he did what he was told. With regard to the sheet rock disposal, Hollis exercised as much control as he could, short of actually riding in the truck. "[T]he right to control ... need only be commensurate with the supervision appropriate to the kind of work to be done and the skill required to do it." *Shinwald v. Mound City Yellow Cab Co.*, 666 S.W.2d 846, 849 (Mo.App. E.D.1984). Hollis chose the dump site and made the necessary arrangements. Hollis told Wright where to go and gave him directions on how to get there. Hollis supervised and worked with Wright during the initial loading of the truck. While he was out of town on the day of the accident, Hollis called Wright and told him to make sure the truck was completely full before he went to the dump site. Hollis was clearly controlling the details of the work.

Second, the record supports a finding that Wright was not engaged in a distinct occupation or business and that little skill was required for the duties he was performing. Despite World Missions' assertions that Wright was a "skilled craftsman" performing the duties of a specialist without supervision, the degree of skill required was minimal. There is no special aptitude necessary to drive a truck up to a pile of sheetrock, load it on the truck, drive the truck to a place pointed out, and dump it as directed. *Pratt v. Reed & Brown Hauling Co.*, 361 S.W.2d 57, 64 (Mo.App. W.D.1962). The only control retained by Wright related to the starting, stopping, and guiding of the truck incident to its operation. This type of work is of such simplicity that it requires neither supervision nor a specialist. *Id.* at 63. Moreover, Wright was not engaged exclusively in the business of operating a dump truck. His truck had sat unlicensed on a vacant lot for an extended period of time and this was the first and only hauling trip Wright made since arriving in Branson. There is substantial support in the record for the proposition that Wright was not engaged in a distinct occupation or business, and that the duties he performed did not require a high level of skill.

On the third factor, whether, under local custom, the work being performed by Wright was typically performed under the direction of an employer or by a specialist acting without supervision, there is nothing in the record from which a determination can be made.

Next, as to the instrumentality used, it is uncontroverted that the truck was owned by Wright. However, the truck had sat unlicensed and unused since Wright brought it to Branson in the fall of 1993. Wright made no effort to get it inspected or licensed until Hollis wanted to use it. Hollis instructed Wright on how to get a tax clearance for licensing purposes. Moreover, he paid for the license. Thus, this factor is neutral at best.

■ The factors involving the length of time Wright was employed and the method of his payment both support the finding of a servant relationship. "[I]f the period of employment is short, it is more likely that the worker is an independent contractor. Conversely, a longer term of employment denotes an employer-employee relationship as being more likely." *Ferguson v. Pony Express Courier Corp.*, 898 S.W.2d at 132 (citations omitted). By the same token, the relationship of master and servant is indicated by payment by the hour. *Id.* at 133. Wright came to Branson with Hollis and worked almost routinely for him up until the time of the accident. Hollis paid Wright by the hour and in fact refused to enter into a contract with Wright on a job basis.

On the dual issues of whether World Missions, as the alleged principal, was in business and whether the work was part of its regular business, there was evidence which again tended to support a master-servant relationship. World Missions is a Texas corporation. It was formed to conduct missionary work. However, World Missions was in the process of selling off its foreign holdings and conceded that it had effectively wound up its missionary affairs. Indeed, World Missions purchased Lot 13 with the proceeds of those sales and was constructing a residential building on the premises. It designated its own vice-president as general contractor. Thus, World Missions was obviously in business, and since it conceded that its

missionary affairs had been effectively wound up, the building project was the only business activity in which it was engaged. Therefore, these factors are at least neutral, if not tending to support the assertion that Wright's activities were part of World Mission's regular business.

Finally, despite Hollis' assertions to the contrary, there was evidence from which it could reasonably be inferred that both Hollis and Wright believed they had created a relation of master and servant. Wright testified he always followed Hollis' orders. Hollis seemed to trust Wright with tasks which ordinarily might not be entrusted to an independent contractor.[3] Furthermore, subsequent to the accident, Hollis asked Wright to tell anyone who asked that he was hauling the sheetrock for Nino, another contractor in the subdivision. This request strongly suggest that Hollis thought of Wright as his agent and was attempting to avoid liability for his agent's negligent act.

From the foregoing, it is apparent that nearly all of the factors listed in § 220(2) of the *Restatement (Second) of Agency* to aid in "determining whether one acting for another is a servant or independent contractor" tend to support the proposition that World Missions retained control, or the right to control, Wright's physical conduct and the details of the work. Consequently, World Missions' contention that there was insufficient evidence to establish that Wright was its agent is devoid of merit.[4] Point denied.

■ In its second point, World Missions argues that the trial court erred in excluding evidence that it was not insured against any liability arising from the use of Wright's dump truck, that Wright had insured the truck in the past, and that Wright was going to visit an insurance agent after dumping the sheetrock. World Missions contends this evidence was probative on the issue of whether Wright was its agent.

"Evidence is relevant if it tends to prove or disprove a fact in issue or corroborates other relevant evidence which bears upon the principal issue." *Stevinson v. Deffenbaugh Indus.*, 870 S.W.2d 851, 860 (Mo.App. W.D. 1993). The trial court's determination of relevancy and its ruling on the admissibility or exclusion of evidence is accorded substantial deference and will not be disturbed absent an abuse of discretion. *Brown v. Hamid*, 856 S.W.2d 51, 56 (Mo. banc 1993). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991).

■ Generally, it is improper to admit evidence that a defendant has or does not have liability insurance. *Annen v. Trump*, 913 S.W.2d 16, 23 (Mo.App. W.D.1995). "Only in rare cases where relevancy is clearly shown should the fact of the existence of insurance coverage be admissible." *Stanford v. Morgan*, 588 S.W.2d 89, 91 (Mo.App. W.D. 1979) (quoting *Stafford v. Far–Go Van Lines, Inc.*, 485 S.W.2d 481, 493 (Mo.App. W.D. 1972)).

In support of its claim that evidence of World Missions' lack of insurance was relevant, World Missions relies on *Muckenthaler v. Ehinger*, 409 S.W.2d 625 (Mo.1966). In *Muckenthaler*, the plaintiff claimed a negligent truck driver, driving his own truck, was an employee of defendant-contractor. Defendant-contractor denied ever hiring the driver and alternatively claimed the driver was an independent contractor. In asserting his claim that he never hired the driver, defendant-contractor sought to introduce evidence that he had a policy of requiring drivers to carry liability insurance as a condition of their employment and that defendant-contractor's superintendent had told driver he

---

3. Wright would occasionally retrieve materials for World Missions from the lumberyard. Hollis also would leave checks with Wright to pay subcontractors working on Lot 13. While Hollis was out of town, he had Wright obtain the building permit for Lot 13.

4. A plaintiff is not obliged to disprove the independent contractor relationship, but only to establish the agency (master-servant) relationship. *Dean v. Young*, 396 S.W.2d 549, 558 (Mo.1965). "Once [the] plaintiff has made a prima facie case of agency, the issue must be submitted to the jury." *Id.*

could not hire him because he did not carry liability insurance. The court found that this evidence was material to both the issue of whether Anderson was ever hired by defendant-contractor and whether he was an employee or an independent contractor. *Muckenthaler*, 409 S.W.2d at 627.

World Missions also relies on *State ex rel. Cummings v. Witthaus*, 358 Mo. 1088, 219 S.W.2d 383 (banc 1949). In *Witthaus*, the corporate defendant claimed a negligent truck driver, who was driving his own truck, was an independent contractor rather than its servant or employee. The plaintiff sought to discover corporate defendant's liability insurance policy covering the truck which struck plaintiff's husband. The court affirmed the decision of the trial court allowing discovery of the defendant's insurance policies, holding that this evidence could be relevant to the issue of whether driver was an independent contractor. *Witthaus*, 219 S.W.2d at 389.

Neither *Muckenthaler* nor *Witthaus* is controlling as both are distinguishable. In *Muckenthaler*, there was evidence that the defendant-contractor had a policy of hiring only drivers who carried liability insurance, and that the defendant-contractor's superintendent had told the truck driver that he could not hire him because he did not carry liability insurance. *Muckenthaler*, 409 S.W.2d at 627. In the case at bar, there is no similar evidence. World Missions' offer of proof sought only to declare that it did not have insurance on Wright. While in *Muckenthaler* the evidence was material on the issue of whether the truck driver had been hired by the defendant-contractor, there was no similar issue presented below. It is uncontroverted that Wright was working for World Missions.

Similarly, *Witthaus* involved a discovery issue. The *Witthaus* court only determined that evidence that an alleged principal carries insurance on its alleged agent may tend to prove the existence of an agency relationship. *Witthaus*, 219 S.W.2d at 389. The court specifically declined to rule on the quantum or probative value of such evidence. *Id.*

Moreover, in both *Witthaus* and *Muckenthaler*, unlike the case at bar, the proffered evidence relating to insurance logically tended to show the existence or absence of an agency relationship. World Missions argues that if evidence that a company insures a driver is relevant to whether the driver is an agent, it logically "follows that evidence the defendant was not insured against liability arising from the acts of the alleged agent, or that the alleged agent had insured against his own liability, tends to disprove the claimed agency relationship." Such is simply not the case under the facts at bar. The evidence adduced at trial established that Wright was the sole owner of the dump truck and that this was the first time World Missions had ever asked him to use the truck. The fact that World Missions did not insure this truck, which it did not own and had never used before, does not make it any less likely that Wright was its agent. The trial court did not abuse its discretion in excluding the proffered evidence. Point denied.

The judgment is affirmed.

All concur.