Robert KAPLAN, as trustee of the Robert Kaplan Trust, and Leonard O'Brien d/b/a Cloverleaf Properties, Respondents,

v.

U.S. BANK, N.A., f/k/a Firstar Bank, N.A., f/k/a Mercantile Bank N.A., and Avanti Marketing Group, Inc. d/b/a Southern Contractors, Appellants.

No. ED 80671.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 18, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 27, 2003.

Case Transferred to Supreme Court July 1, 2003.

Case Retransferred to Court of Appeals Oct. 28, 2003.

Original Opinion Reinstated Nov. 10, 2003.

Thomas P. Rosenfeld, Clayton, MO, Jeffrey R. Curl, Hannibal, MO, for respondents.

Mark G. Arnold, Clayton, MO, Shirley A. Padmore, Seth G. Gausnell, St. Louis, MO, for appellants.

Curtis R. Bailey, Swansea, IL, for defendants.

GLENN A. NORTON, Judge.

This case involves the disposal of contaminated concrete from a remediation site onto plaintiffs' property. A jury found the Bank and Southern Contractors liable for actual and punitive damages on the plaintiffs' trespass and negligence claims. The Bank appeals the finding that it could be held vicariously liable for Southern's conduct under the doctrine of *respondeat superior* and the finding that it owed a duty to the plaintiffs under the remediation work plan. Southern appeals the damages instruction, the refusal to award all of its attorney fees and the assessment of costs against it. Both defendants appeal the punitive damages awards. We affirm in part and reverse in part.

## I. BACKGROUND

Mercantile Bank, now known as U.S. Bank, held a security interest in a site contaminated with high levels of polychlorinated biphenyls, or PCBs. The corporation that owned the site defaulted on its loan with the Bank and shut down operations at the site. At all relevant times thereafter, that corporation existed only as a shell, and the Bank acted as the true owner of the site. In 1994, the Bank, the shell corporation and the former owners of the site reached an agreement to remediate, under which the Bank was responsible for removing materials with PCB levels of less than 10 parts per million ("ppm").

The former owners drafted a work plan describing the method for completing the remediation. The work plan mandated that the parties adhere to certain procedures to prevent "illegal or inappropriate disposal" of materials. All materials with less than 10 ppm of PCB were to be disposed of at permitted landfills or used on-site as backfill.

By late 1995, only materials with less than 10 ppm of PCB remained on the site. In January 1996, the Bank entered into a contract with Southern to remove and dispose of these and other materials. Under the contract, the Bank had the right to decide which materials would be taken off site and where they would be taken. The Bank decided to remove all materials from the site, including stockpiles of concrete. The parties executed a change order in June, under which Southern was to dispose of PCB-contaminated materials at one of two specified landfills. All clean fill was to be removed from the site, and the Bank was to be notified of its destination in advance. The stockpiles of concrete were not tested for contamination before they were removed.

Southern was approached by several homeowners who saw the concrete stockpiled at the site and wanted to use it to fill a ditch behind their homes. Southern told them that the concrete was clean. During the summer of 1996, Southern filled the ditch with 5900 tons of concrete removed from the site. Part of the ditch was actually owned by a mobile home park located across the ditch from the homeowners. The owners, Robert Kaplan and Cloverleaf Properties (collectively "the plaintiffs"), had not given Southern permission to dump the concrete on their property.

Southern did not tell the Bank it was taking the concrete to this ditch, and the Bank never asked where the concrete had been taken. The Bank claimed not to have known about the concrete's disposal until December of 1996 when the plaintiffs discovered that the ditch had been filled and had caused the mobile home park to flood. For the first few months of 1997, Southern and the plaintiffs discussed testing and removal of the concrete. The concrete tested positive for PCBs. That spring, the Bank became involved in the discussions, which by the end of the summer had devolved to the point that the plaintiffs concluded the Bank was never going to agree to their demands for removing the concrete and settling their claims. In November of 1997, the plaintiffs filed suit in federal court, which was voluntarily dismissed, and in October of 1998, this lawsuit was filed.

The plaintiffs asserted claims against Southern and its president for trespass, negligence and ordinance violations. The plaintiffs claimed that the Bank was vicariously liable for Southern's trespass and negligence under the doctrine of *respondeat superior* and that the Bank also was directly liable based on its duty under the work plan to properly dispose of the concrete.

After a three week trial, the jury found for the plaintiffs on the trespass and negligence counts and found that the Bank was responsible for Southern's conduct. The jury found that Southern and its president did not violate any ordinances. The jury assessed 80% of the fault to the Bank and 20% to Southern. The plaintiffs were awarded $650,000 in compensatory damages; $7,000,000 in punitive damages was assessed against the Bank and $225,000 against Southern. The court entered judgment on the verdicts and awarded Southern and its president $1,000 of its attorney fees as the prevailing parties on the ordinance violation claim. The Bank and Southern were ordered to pay all of plaintiffs' costs.

## II. DISCUSSION

### A. Liability Issues

#### 1. The Bank's Vicarious Liability for Southern's Conduct

In its first point, the Bank claims that the trial court erred by entering judgment on the jury's verdict against it because the plaintiffs did not make a submissible case of *respondeat superior*. The Bank claims that it did not have the right to control Southern's physical conduct and, therefore, cannot be held vicariously liable for Southern's conduct under the doctrine of *respondeat superior*. We agree.

Respondeat superior* is inapplicable unless a master-servant relationship exists. *Trinity Lutheran Church v. Lipps,* 68 S.W.3d 552, 557 (Mo.App. E.D.2001); *see also Hougland v. Pulitzer Publishing Co., Inc.,* 939 S.W.2d 31, 33 (Mo.App. E.D. 1997). If it applies, then the master is liable for damages resulting from the servant's negligent acts committed within the scope of employment. *Lipps,* 68 S.W.3d at 557.

A master-servant relationship exists when "the person sought to be charged as master had the right or power to control and direct the physical conduct of the other while working." *Hougland,* 939 S.W.2d at 33. "If there is no right to control, there is no liability; those rendering services but retaining control over their own movements are not servants." *Lee v. Pulitzer Publishing Co.,* 81 S.W.3d 625, 631 (Mo.App. E.D.2002). A master-servant relationship is not necessarily established because the purported master controls the outcome of the work:

> [S]tipulations which entitle the employer to exercise a certain measure of control over the work, but go no further than to enable him to secure that it shall be properly performed, do not affect the quality of contracts which, apart from those stipulations, would be construed as independent.

*Williamson v. Southwestern Bell Telephone Co.,* 265 S.W.2d 354, 358 (Mo.1954). When one contracts to do a piece of work by his own methods and not subject to the control of an employer except as to the result, he is an independent contractor and the employer cannot be held vicariously liable under the doctrine of *respondeat superior*. *See Lipps,* 68 S.W.3d at 557 (citing *Talley v. Bowen Construction Co.,* 340 S.W.2d 701 (Mo.1960)).

The master-servant relationship is a question of law for the court when the material facts from which the relationship is to be inferred are not in dispute and lead to only one reasonable conclusion. *Johnson v. Bi–State Development Agency,* 793 S.W.2d 864, 867 (Mo. banc 1990). The parties' differing opinions as to the legal effect of documents or actions that determine the relationship do not create an issue of fact for the jury. *Hougland,* 939 S.W.2d at 33. Here, while the parties obviously dispute the meaning and legal effect of the Bank's contract with Southern and their conduct thereunder, the underlying material facts are not in dispute.

Under the contract, Southern clearly had control over its physical conduct and performance of the work: "[Southern] shall supervise and direct the work, using [its] best skill and attention, and shall be solely responsible for all means, methods, techniques, sequences and procedures used to complete the work." Southern was responsible for providing and paying for all labor, materials, equipment and facilities needed to complete the work, including equipment and labor needed to prepare any materials for use as fill. Southern was responsible for paying all taxes and for securing any permits, licenses, or inspections needed to complete the

work. Southern was responsible for ensuring that the work complied with applicable laws. Southern was responsible for keeping the work-site clean and for ensuring the safety of others at the site. Southern also agreed to indemnify the Bank. Although the contract required Southern to work during normal working hours and complete the project by a certain date, Southern was responsible, at its own expense, for taking the steps necessary to complete the work on time. Southern agreed to cooperate with the Bank in the development of schedules or plans to minimize interference with other operations on the site. Southern was responsible for maintaining insurance.

The Bank, on the other hand, had limited rights and responsibilities under the contract and no control over Southern's physical conduct: it had access to the site, could reject non-conforming work and could terminate the contract with notice. The Bank's control was primarily over the scope of the work. The contract described the scope of the work, in part, as general site reclamation work, which involved the removal and disposal of certain materials. The Bank had the right to approve the reuse of demolished materials on-site and the method for compacting those materials. "All materials resulting from the demolition portion of the above work that is not approved by [the Bank] for use as on[-]site fill shall be removed from the site and properly disposed of by Southern as part of the work under this contract." The June change order further specified the plan for disposal: all debris was to be crushed, loaded and disposed or installed; materials contaminated with PCBs were to be disposed of at one of two specified locations and were not to be used as fill on-

site; and any "clean material" not used for fill was "to be removed from premises." As to this "clean material," the Bank was "to be notified in advance of shipment all locations this material is to be shipped to and estimated quantities." There was consistent testimony that the Bank actually had the right to direct where any material would be taken.

The contract alone leads to only one conclusion: the Bank did not have the right or power to control or direct the physical conduct of Southern in the performance of the work. Nor does the testimony that the Bank actually had control over where the material was to be taken create a master-servant relationship.[1] The control the Bank had over the scope of work, including the right to determine where the material was disposed, amounts to, at best, a right to control the outcome of the work. This control did not extend over the physical conduct of Southern in its performance of this work. Thus, Southern was an independent contractor, not a servant.

Several cases illustrate that this type and amount of control is insufficient to create a master-servant relationship. For example, in *Williamson,* the phone company entered into a written contract with a tree trimming service to clear a right-of-way. 265 S.W.2d at 356. One of the trimming service workers injured the plaintiff in a car accident, and she sued the phone company. *Id.* On appeal from the directed verdict in favor of the company, the Supreme Court found that although the company (1) had the power to control and arrange for timber disposal and, allegedly, the power to direct the trimming methods, (2) furnished blueprints and plats specifying the work to be done, and (3) had

1. The Bank contends that this testimony is improper parol evidence. Whether or not this testimony is considered, however, we agree with the Bank that the doctrine of *respondeat superior* does not apply.

the right to direct the trimmers to work on certain spots, there was no "fair or reasonably permissible inference" that the company and trimming service had a master-servant relationship. *Id.* at 360. The company's control was only to ensure that the work was properly performed. *Id.* at 358. The Bank's rights to define the scope of Southern's removal and disposal work, including where to dispose, no more created a master-servant relationship than did the phone company's rights to tell the trimmers what, where and how to trim and where to dispose of the trimmings. *See also Lipps,* 68 S.W.3d at 554 (landowner did not have right to control details of work done by logger hired to fell and dispose of trees).

This case is also similar to cases involving delivery persons. In *Collins v. Feldman,* for example, a delivery company signed an agreement with a driver, under which he was designated an independent contractor. 991 S.W.2d 718, 719 (Mo.App. E.D.1999). This Court found that, although the company provided the parcels for delivery, required that they be delivered the same day and directed the driver where to leave the parcels, "the operational details were determined by [the driver]." *Id.* at 720. The company did not have the right or power to control or direct the details of delivery and distribution or any other of the driver's acts in the performance of the contract. *Id.* If a delivery driver whose product, destination and location of delivery are controlled by the company is not that company's servant, then a demolition company like Southern who is told what to remove and where to take it by the Bank is not the Bank's servant. *See also Hougland,* 939 S.W.2d at 32–35 (newspaper publisher did not have right to control carrier's physical conduct in performance of delivering newspapers). Our courts require a much greater degree of control over the work. *See, e.g., Mucken-*

*thaler v. C.S. Ehinger,* 409 S.W.2d 625, 626–27 (Mo.1966) (truck driver's hours, place of work, route to work, load, manner of loading and unloading were all under employer's control).

The plaintiffs direct our attention to cases involving hauling, such as *Carter v. Wright,* 949 S.W.2d 157 (Mo.App. W.D. 1997). The facts relevant to the amount of control over the hauler's operations in *Carter* were very different than in this case. There, the court found that the contractor, appointed by and vice-president of the construction site owner, "exercised as much control as he could, short of actually riding in the truck" driven by the hauler hired to remove sheetrock from the site. *Id.* at 161. The contractor chose the place of disposal, made the necessary arrangements, told the driver where to go and how to get there and supervised and worked with the driver during loading of the truck or called in to ensure that the truck was full before leaving the site. *Id.* The hauler only had control over starting, stopping and guiding the truck. *Id.* The contractor was "clearly controlling the details of work." *Id.*

■ Here, the converse is true: Southern, not the Bank, had as much control as it could have had over the removal and disposal of materials from this site, short of choosing what to dispose and where to take it. The Bank had no input regarding loading or unloading, did not give Southern directions, did not make the arrangements for disposal and did not clearly control the details of Southern's work.

In addition, the Restatement (Second) of Agency establishes several factors to consider in determining whether one acts as a servant or an independent contractor. Section 220(2)(a)-(j) (1958); *see also Lipps,* 68 S.W.3d at 559. As we have already discussed, the Bank exercised little if any

control over the details of Southern's work. *See* subsection (a). Southern was in the distinct business of demolition and environmental remediation, and there is no evidence that this type of work is normally done under the direction of the Bank. *See* subsections (b) and (c). Removal and disposal of contaminated waste materials is not part of the Bank's regular business, which is ongoing. *See* subsections (h) and (j). We disagree with the plaintiffs that, like the driver hauling sheetrock, there is little or no skill required in the removal and disposal of waste materials from this site. *See* subsection (d); *Carter,* 949 S.W.2d at 161. Although the work was done at the Bank's site, Southern supplied all of its own equipment and labor. *See* subsection (e). Southern had been engaged as a consultant for the Bank for several years, but was paid by the job, not by the hour. *See* subsections (f) and (g). Southern alone may have believed that it could act as the Bank's "agent" when it negotiated a plan to test the concrete after it had been dumped on plaintiffs' property. But there is no evidence that the parties believed they had created a master-servant relationship that would subject the Bank to liability for Southern's conduct. *See* subsection (i). On balance, these factors lead to the conclusion that Southern was not the Bank's servant.

In sum, the contract and circumstances of this case show that the Bank did not have the right or power to control or direct the physical conduct of Southern in its performance of the work under this contract. The Bank hired Southern to do a job that was outside the Bank's area of expertise and limited its involvement to ensuring the outcome of that job. Plaintiffs failed to make a submissible case that Southern was the Bank's servant; therefore, the Bank cannot be held vicariously liable for the trespass or negligence of Southern under the doctrine of *respondeat superior.*

The Bank's Point I is granted.

### 2. The Bank's Direct Liability for Negligence

In its second point, the Bank contends that the trial court erred by entering judgment on the plaintiffs' negligence claim because the plaintiffs were not parties to the work plan and, therefore, the Bank owed them no duties thereunder.[2] We disagree. Whether the Bank owed the plaintiffs a duty under the work plan is a question of law. *See L.A.C. ex rel. D.C. v.*

**2.** The plaintiffs argue that the Bank's oral motion for a directed verdict did not preserve this issue for appeal. We disagree. Rule 72.01(a) requires that "[a] motion for a directed verdict shall state the specific grounds therefor," but we will construe a motion liberally if the basis for it is apparent and the record reveals that the trial court was fully aware of the movant's position. *See Frisella v. Reserve Life Ins. Co. of Dallas,* 583 S.W.2d 728, 731–32 (Mo.App. E.D.1979). Here, the Bank asserted in its oral motion that plaintiffs had only pled the Bank's failure to comply with statutes, ordinance and regulations and the Bank's negligent hiring of Southern and there was no evidence of either. "So they have failed to show a duty as pleaded." In response, the plaintiffs asserted that they had also pled the Bank's failure to supervise, monitor and account for disposal by Southern, of which there was sufficient evidence. The Bank replied that it "had no duty to supervise or do any of the things that [counsel] is talking about. It had no duty at all to do it." The Bank's motion was denied, and the plaintiffs submitted the negligence claim based solely on the Bank's failure to comply with the work plan. The Bank claims that the plaintiffs had not mentioned a duty under the work plan specifically until they submitted jury instructions, and thus, the Bank could not have objected specifically on the ground that there was no such duty under the work plan until the instruction conference, which it did. We believe that the trial court was fully aware of the Bank's position that it had no duty under the plan. The issue has been preserved.

*Ward Parkway Shopping Center Co., L.P.,* 75 S.W.3d 247, 257 (Mo. banc 2002).

 A defendant who has contracted with another owes no duty to a plaintiff who is not a party to the contract, nor can a non-party sue for negligent performance of the contract. *Fleischer v. Hellmuth, Obata & Kassabaum, Inc.,* 870 S.W.2d 832, 834 (Mo.App. E.D.1993). This general rule of privity is designed to protect contractual parties from exposure to unlimited liability and to prevent burdening the parties with obligations they have not voluntarily assumed. *Westerhold v. Carroll,* 419 S.W.2d 73, 77 (Mo.1967). But when application of this rule is not necessary to protect the contractual parties, or when it would produce results contrary to justice and public policy, our courts make exceptions. *See generally id.* The liability of a contractual party to those not in privity is determined on a case-by-case basis and, when imposed, the limits of that liability must be carefully defined. *Id.* at 77–78.

 The plaintiffs' negligence claim against the Bank falls under one of the well-recognized exceptions to the privity rule: situations where the alleged negligence involves harm to others. *See L.A.C.,* 75 S.W.3d at 262. When a defendant undertakes to do something that the defendant knew or should have foreseen would harm others or increase the risk of harm to others, the defendant has the duty to exercise reasonable care in the undertaking. *See Wolfmeyer v. Otis Elevator Co.,* 262 S.W.2d 18, 21 (Mo.1953); *see also L.A.C.,* 75 S.W.3d at 262; RESTATEMENT (SECOND) OF TORTS section 324A (1965). The proper inquiry is whether the defendant has assumed a duty of reasonable care to prevent foreseeable harm to the plaintiff. *L.A.C.,* 75 S.W.3d at 263. The existence and scope of the duty is determined by the contractual obligations the defendant undertook and the circum-

stances of the case. *Hunt v. Jefferson Arms Apartment Co.,* 679 S.W.2d 875, 882–83 (Mo.App. E.D.1984); *see also L.A.C.,* 75 S.W.3d at 263.

In *L.A.C.,* the plaintiff was raped at a mall and sued the company who had contracted with the mall's management to provide mall security. *Id.* at 263. The Supreme Court found that the contract clearly set out a general duty on the part of the company to provide adequate security for mall patrons. *Id.* Most importantly, the company was given express authority to detain people "to protect . . . mall customers or employees from risk of serious injury" and the company agreed to cooperate with mall management in determining staffing levels "to provide full and adequate security to the mall." *Id.* at 251. The Court held that these provisions created a duty on the part of the company to exercise reasonable care to prevent foreseeable harm to mall patrons, including the plaintiff. *Id.* at 263.

In *L.A.C.,* the majority focused solely on foreseeability and did not, as the dissenting opinion points out, address the liability to which the defendant might be exposed. 75 S.W.3d at 265 (C.J. Limbaugh, dissenting). The dissent believed that *Westerhold* forbid the Court from imposing a duty because it would subject the company to "unlimited liability to an unlimited number of persons—the many thousands of patrons and employees of the mall." *Id.* The majority responded to this charge by quoting *Westerhold* directly:

"[A] party by entering into a contract may place himself in such a relation toward third persons as to impose upon him an obligation to act in such a way that the third persons will not be damaged. *Wolfmeyer v. Otis Elevator Co.,* 262 S.W.2d 18. In *Lambert v. Jones,* 339 Mo. 677, 98 S.W.2d 752, 758, it was stated that where one under contract

with another assumes responsibility for property or instrumentalities and agrees under his contract to do certain things in connection therewith which, if left undone, would likely injure third persons, 'there seems to be no good reason why [he] should not be held liable to third persons injured thereby for his failure to do that which he agreed to do, which he assumed responsibility for, and which was reasonably necessary to be done for their protection.' "

*L.A.C.*, 75 S.W.3d at 266 n. 13 (quoting *Westerhold*, 419 S.W.2d at 80).

 Here, the following provision of the work plan provides the source of the Bank's duty to properly dispose of the concrete:

> Waste segregation and handling procedures will be enforced to preclude mixing or misdirection of materials that could result in illegal or inappropriate disposal of wastes or on-site/off-site use of materials.

All parties to the work plan, including the Bank, undertook to prevent illegal or inappropriate disposals. Under the agreement to remediate, the Bank's duty was limited to the proper disposal of materials with less than 10 ppm of PCB. The work plan provided that these materials could be used on-site as backfill; as the plaintiffs point out, other provisions suggest that all material with up to 40 ppm of PCB would be disposed of at permitted landfills. It is clear from these provisions that the Bank had a duty to prevent contaminated concrete from being disposed of anywhere other than at a landfill or on the site. This duty included the duty to prevent against disposal on property without the owner's permission. The harm that could befall property owners from the dumping of contaminated materials without the owners' permission, including these plaintiffs, was foreseeable.

Although it seems that foreseeability is the only issue to be addressed under *L.A.C.*, we note that the exposure to liability here is limited to owners on whose property these contaminated materials were actually dumped without their permission and that the duty only imposes on the Bank the obligation not to dump contaminated materials on unwilling recipients—something the Bank had no right to contract to do in the work plan anyway. Therefore, none of the reasons for applying the rule of privity exist in this case. *See Westerhold*, 419 S.W.2d at 77. In fact, we believe that to impose the rule in this case would produce results contrary to justice and public policy. *See id.*

We have no opinion, and nothing herein should be construed as an opinion, about other duties the Bank may have undertaken in the work plan or because of the circumstances of this remediation project, or about other plaintiffs to whom those duties might be owed. Our holding is limited: the Bank had a duty in this case to these plaintiffs and there was no error in submitting to the jury the plaintiffs' claim that the Bank was negligent in carrying out that duty.

The Bank's Point II is denied.

## B. Damages Issues

### 1. Damages Instruction

In its first point, Southern argues that the trial court erred by submitting the following instruction regarding damages:

> If you find in favor of plaintiffs, then you must award the plaintiffs such sum as you may find from the evidence to be the reasonable cost of repair of any damage to plaintiffs' property.

 Generally, the measure of damages for tortious injury to property is its diminished value—the difference between the fair market value of the proper-

ty immediately before and immediately after the injury. *See Sheridan v. Sunset Pools of St. Louis, Inc.,* 750 S.W.2d 639, 641 (Mo.App. E.D.1988); *see also* MAI 4.02. But when there is evidence that the amount of damage is insignificant, as compared to the value of the property as a whole, and involves only a small part of the property, the "cost of repair" measure is proper and the above instruction is appropriate. *See Sheridan,* 750 S.W.2d at 641; *see also* MAI 4.02, Committee Comment (quoting *Gulf, M. & O.R. Co. v. Smith–Brennan Pile Co.,* 223 S.W.2d 100 (Mo. App.1949)). Our Court has explained the rationale behind the different measures:

> [W]here the injury is extensive or permanent the measure of damages is the reduction in the overall value of the property as a whole; in contrast, where the injury is slight when compared with the overall size and value of the realty and the injury can readily be remedied by repair, then the measure of damages is the expense of restoration. The latter method is not inconsistent with the former. This, because *in the case of slight injury the cost of repair logically reflects the amount the property was reduced in value.*

*Smith v. Norman,* 586 S.W.2d 84, 85 (Mo. App. E.D.1979) (emphasis added). While diminished value is the preferred measure of damages in tort cases because it restores plaintiffs to the positions they were in had the tort not been committed, the particular facts of each case determine which measure is appropriate. *See McLane v. Wal–Mart Stores, Inc.,* 10 S.W.3d 602, 605–606 (Mo.App. E.D.2000). ■ Ordinarily, to make that determination, the court would need evidence permitting it to compare diminished value with the cost of repair or, at least, evidence permitting "an inference that the cost of repair is a fraction of the diminish-

ed value." *Sheridan,* 750 S.W.2d at 641–42; *see also* MAI 4.02, Committee Comment; *see also Flora v. Amega Mobile Home Sales, Inc.,* 958 S.W.2d 322, 324 (Mo.App. W.D.1998). Southern claims that there was insufficient evidence to make the determination in this case. We disagree.

■ The cost of cleaning up the contamination on plaintiffs' property was specifically identified at $636,781.66, and based on the later sale of that property for $6.7 million, the cost of repair was a little more than 10% of the property's whole value. The damage may have been extensive, but given that it was capable of repair, the damage was not permanent. There was also evidence that immediately after the injury, the plaintiffs' tenant would only continue in its lease if the plaintiffs paid for cleaning up the contamination and indemnified the tenant forever for all future liability arising from the contamination. These conditions on the lease show the diminished value of the property.

From this evidence, it can be inferred that the cost of repair was either less than or equal to the diminished value. If perpetual indemnity has *any* value, then that added to the cost of repair amounts to the diminished value. If so, then the cost of repair was the proper measure of damages. *See Sheridan,* 750 S.W.2d at 641; *see also* MAI 4.02. If, on the other hand, the value of perpetual indemnity is zero— either because indemnity has no value or because there is no evidence that could establish that value with certainty—then diminished value is demonstrated by just the cost of repair. If so, then the cost of repair logically reflects the amount the property was reduced in value and is the proper measure of damages. *See Smith,* 586 S.W.2d at 85.

Southern's Point I is denied.

## 2. Punitive Damages against Southern

In its second point, Southern claims that the evidence did not support the award of punitive damages on either of the claims against it. We disagree.

■ Sufficiency of the evidence to warrant a jury award of punitive damages is a question of law, within the reasoned discretion of the trial court. *DeLong v. Hilltop Lincoln–Mercury, Inc.*, 812 S.W.2d 834, 841 (Mo.App. E.D.1991). In reviewing the submissibility of a claim for punitive damages, we view the evidence and all reasonable inferences drawn therefrom in the light most favorably to the plaintiff and disregard all contrary inferences. *M.C. v. Yeargin*, 11 S.W.3d 604, 614 (Mo.App. E.D. 1999); *see also Shady Valley Park & Pool, Inc. v. Fred Weber, Inc.*, 913 S.W.2d 28, 37 (Mo.App. E.D.1995).

■ The remedy of punitive damages—imposed as punishment for and deterrence of bad conduct—is "so extraordinary or harsh that it should be applied only sparingly." *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996). Punitive damages must be proven by clear and convincing evidence. *Id.* "Submission of a punitive damages claim to the jury warrants special judicial scrutiny because the instructional standards for punitive damages are necessarily general." *Alcorn v. Union Pacific R.R. Co.*, 50 S.W.3d 226, 247 (Mo. banc 2001).

■ In a negligence case, the defendant can be assessed punitive damages if he knew or should have known that his conduct "created a high degree of probability of injury" and "thereby showed complete indifference to or conscious disregard for the rights of others." *Alcorn*, 50 S.W.3d at 248. According to the Supreme Court, the jury may find that the mere fact that the injury occurred indicates a "high degree of probability of injury." *Id.* Likewise, "[a] defendant's aggressive defense at trial on either the issue of breach of duty or causation may supply, in the jurors' minds, the 'complete indifference' or 'conscious disregard' element." *Id.* Thus, to make a submissible case, there must be a judicial determination that the conduct was so egregious that it was "tantamount to intentional wrongdoing" and such that injury is the "natural and probable consequence" of the conduct. *Id.*

■ For intentional tort cases, including trespass, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others." RESTATEMENT (SECOND) OF TORTS section 908(2) (1979); *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989). Whether plaintiffs made a submissible case depends on whether a reasonable juror could have found that Southern's conduct showed complete indifference to or a conscious disregard for the plaintiffs' rights. *See Shady Valley*, 913 S.W.2d at 37.

The evidence supported submission of the punitive damages claim against Southern on both the trespass and negligence claims.

■ As to trespass, a reasonable juror could have concluded that Southern's reliance on the homeowners' identification of their property line and their statement that adjoining owners wanted the concrete dumped in the ditch demonstrated Southern's disregard and indifference to plaintiffs' rights. This was especially outrageous here because the concrete was contaminated. Moreover, there was conflicting evidence about the timeliness of Southern's offers to correct the problem and about whether they were made in good faith. Viewing the conflicting evidence favorably to the plaintiffs, a reason-

able juror could have concluded that this conduct showed complete indifference to or conscious disregard for the plaintiffs' rights.

As to negligence, in addition to the above evidence, Southern admits that it knew it was to assume all the material at the site, including the concrete at issue here, contained PCBs. Southern claims that there was evidence of additional testing, some of which was just a visual inspection of the site, that led it to assume that the concrete dumped on plaintiffs' property contained either less than 10 ppm or was clean. There was also evidence that Southern was aware of the risk of cross-contamination at the site, which Southern knew required additional testing to ensure that previously clean materials had not become contaminated. This knowledge, plus the facts relating to the plaintiffs' property line and Southern's conduct in negotiating the clean-up of plaintiffs' property, demonstrate a pattern of conduct so egregious that it is the equivalent of intentional wrongdoing, of which the plaintiffs' harm was the natural and probable consequences.

Southern's Point II is denied.

### 3. Punitive Damages against the Bank

In its third point, the Bank argues that the claims for punitive damages against it were not sustainable for various reasons. We disagree. Some of the Bank's arguments are moot in light of our finding that the Bank cannot be vicariously liable for actual or punitive damages for Southern's trespass or negligence.[3] Thus, we will address only the contention that there was

no evidence to support submission of punitive damages against the Bank for its negligence under the work plan.

As discussed above, to make a submissible case for punitive damages on a negligence claim, the plaintiffs were required to show by clear and convincing evidence that the Bank knew or should have known that its conduct "created a high degree of probability of injury" and "thereby showed complete indifference to or conscious disregard for the rights of others." *Alcorn*, 50 S.W.3d at 248. The conduct must be so egregious that it is "tantamount to intentional wrongdoing" and injury is the "natural and probable consequence." *Id.*

■ The evidence supported submission of the punitive damages claim against the Bank on the negligence claim. The conduct at issue here is the Bank's failure to properly dispose of the concrete under the work plan. The Bank breached that duty by failing to either dispose of this contaminated concrete at a landfill or use it as backfill on-site. The Bank knew that the stockpiled concrete could have been contaminated: it was aware that cross-contamination was a problem at the site and knew that the work plan's mandate to segregate materials to prevent cross-contamination was not being followed. In fact, the Bank's consultant at the site sent the Bank photos showing contaminated materials mixed in with clean concrete. After learning of these problems, the Bank reduced the consultant's role in the project. The consultant was brought back several months later for spot sampling, and he reported to the Bank that Southern was adding contaminated concrete to the

---

**3.** Those arguments are (1) that plaintiffs improperly based their claim for punitive damages on the Bank's refusal to take responsibility because that responsibility only existed if a master-servant relationship was proven, (2) that plaintiffs did not make a submissible case for punitive damages on the trespass claim because there was substantial evidence that the Bank tried to correct the trespass and (3) that there is no vicarious liability for punitive damages in Missouri without ratification by the principal.

stockpiles earmarked for removal. The Bank responded only by having the soil underneath the stockpile tested, but not the stockpiled concrete itself.[4]

When it came time, the Bank chose the least expensive option for disposing of these stockpiles of concrete and the one that required no further testing: it told Southern just to take it off site. The Bank knew or should have known that by sending it off site for disposal at an unknown location without further testing created a high degree of probability of injury—namely, harm to the value of the property on which the contaminated material was disposed. In doing so, the Bank showed complete indifference to and conscious disregard for others' rights. This conduct was so egregious that it is the equivalent of intentional wrongdoing, of which the plaintiffs' harm was the natural and probable consequences.

The Bank's Point III is denied.

In its fourth point, the Bank contends that, even if punitive damages are allowable here, the amount of this award is excessive. This point is also moot in light of our decision to remand for a new trial as to the amount of those damages, which is further explained at the end of this opinion. *See* section D, *infra.*

The Bank's Point IV is moot.

## C. Attorney Fees and Costs Issues

### 1. Attorney Fees

In its third point, Southern contends that the trial court abused its discretion by awarding it only $1,000 of its attorney fees as the prevailing party on the ordinance violation claim. We disagree.

 Trial courts are considered experts on attorney fees. *Distler v. Reuther*

*Jeep Eagle,* 14 S.W.3d 179, 186 (Mo.App. E.D.2000). The amount of attorney fees awarded is within the sound discretion of the trial court, and the award will only be reversed if the trial court arrived at the award arbitrarily or if the award is so unreasonable that it indicates indifference and lack of proper judicial consideration. *Id.*

Southern argues that when there are multiple counts with a common core of facts, related legal theories and indistinguishable damages, attorney fees need not be allocated to each claim. It cites *Brockman v. Soltysiak,* 49 S.W.3d 740, 746 (Mo. App. E.D.2001) and *Architectural Resources, Inc. v. Rakey,* 912 S.W.2d 676, 679–82 (Mo.App. S.D.1995) in support. In *Brockman,* this Court found no abuse of discretion in a trial court's award of fees without allocation where the damages sought against the two defendants on different claims—breach of contract and unjust enrichment—were indistinguishable and indivisible. 49 S.W.3d at 746. In *Rakey,* the Southern District found no abuse of discretion in the trial court's award of fees based on the combined expenses incurred preparing and presenting evidence that the trial court found to be applicable to all claims. 912 S.W.2d at 679–82.

 Even if Southern is correct that it was not required to allocate which of its fees went with which claim, neither of the above cases establish that it is an abuse of discretion for the trial court to award only a portion of fees when there are multiple claims, even if they are related. Here, there was no abuse of discretion in awarding only that portion of Southern's fees the trial court found attributable to the ordinance claim—the only claim on which

---

4. The consultant testified that the Bank had tried to prevent him from attending the trial by claiming that the plaintiffs' subpoena for his testimony was not valid and that, therefore, he did not have to show up for trial.

Southern prevailed and the only claim for which it was statutorily entitled to fees. First, the damages on the claims were not indistinguishable and indivisible. On the trespass and negligence counts, the plaintiffs sought actual and punitive damages, whereas on the ordinance violation, they sought the statutory civil penalties. Second, it does not appear that the testimony was equally applicable to all counts. For instance, evidence relating to the relationship between Southern and the Bank and the conduct of the parties in negotiating testing and remediation of plaintiffs' property, which occurred after the acts allegedly constituting ordinance violations, was not applicable to the ordinance claims. Moreover, these theories of liability are not related. The multiple claims in this case were not so intertwined that it was impossible for the trial court, based on the evidence of counsel's detailed time records and from an evaluation of the evidence at trial, to have allocated a specific amount of fees to just the ordinance violation.

Nor has Southern shown that the amount of fees awarded was so arbitrary as to constitute an abuse of discretion. Southern contends that the trial court should have considered that this matter was important, time-consuming and complex and that Southern prevailed. There is no indication, however, that the trial court did not consider these things in reaching its amount. The court could have found that the importance, amount of time required and complexity of the ordinance claim were slight in comparison to litigating all of the claims. Moreover, Southern lost on *all* the other claims. In light of these factors, the $1,000 fee award is not so unreasonable as to indicate indifference or a lack of judicial consideration.

Southern's Point III is denied.

## 2. Costs

Prevailing parties in civil actions shall recover their costs. Section 514.060 RSMo 2000 [5]; *see also* Rule 77.01. Where a party prevails on some but not all counts in a multiple count petition, however, costs shall be awarded at the discretion of the court. Section 514.090; *Hoag v. McBride & Son Inv. Co., Inc.*, 967 S.W.2d 157, 175 (Mo.App. E.D.1998). As a result of this appeal, the plaintiffs have prevailed on fewer of the major issues than they had at the time the court awarded the plaintiffs all of their costs. While the plaintiffs could still be deemed the "prevailing party," we believe that the trial court is in the best position to determine how costs should be apportioned in light of this appeal. *See Drey v. McNary*, 529 S.W.2d 403, 413 (Mo. banc 1975). Thus, we will reverse the award of costs and remand to the trial court for re-assessment of costs. On remand, the trial court is free to award the plaintiffs all of their costs, or only a portion thereof, in its discretion.

Because the issues raised by Southern concerning costs are likely to arise on remand, we will address them here. Items not specifically authorized by statute or agreement are not taxable as costs. *Groves v. State Farm Mut. Auto. Ins. Co.*, 540 S.W.2d 39, 44 (Mo. banc 1976). Southern argues that many of the items taxed as costs were unauthorized or unreasonable. We agree that expenses for "multimedia"—charges for rush videotape duplication, legal photography and courtroom technology consultants—are not specifically authorized as taxable as costs by statute. Nor is there any statutory authority for taxing as costs photocopying expenses. Similarly, when a party is required by statute to secure a transcript, the costs thereof are taxable under section 514.060. *See, e.g., Reed v. City of Springfield*, 841 S.W.2d 283, 285 (Mo.App. S.D.

---

**5.** All statutory references are to RSMo 2000.

1992). But there is no authority for taxing as costs expedited transcripts ordered by a party for its own convenience.

■ Witness fees, on the other hand, are authorized. *See* section 491.280. Southern argues that many of the witnesses were duplicative and, therefore, taxing them as costs was unreasonable. We agree with the plaintiffs that the trial court is in the best position to decide the necessity of each witness.

Southern's Point IV is granted in part and denied in part.

### D. Disposition and Instructions on Remand

The verdict against the Bank on the plaintiffs' trespass claim, based entirely on the doctrine of *respondeat superior*, and the portion of the verdict finding that the Bank is responsible for Southern's negligence must be set aside. Naturally, because the trespass verdict against the Bank is set aside, the plaintiffs cannot recover actual or punitive damages from the Bank on that count. *See Williams Carver Co. v. Poos Bros., Inc.*, 778 S.W.2d 684, 686 (Mo.App. W.D.1989).

The jury was given separate punitive damages instructions for each defendant and for each claim, but given only one place on the verdict form to enter an amount of punitive damages for each defendant based on a finding of liability on either trespass or negligence. As a result, we cannot determine from the jury's verdict what, if any, of the $7 million in punitive damages was based on the Bank's vicarious liability for trespass and what part, if any, of the award was based on the Bank's direct liability for negligence. We believe that remanding for a new trial only on the issue of punitive damages for the Bank's negligence will not work an injustice, and in fact, is in the best interest of justice. *See generally Grose v. Nissan North America, Inc.*, 50 S.W.3d 825, 834 (Mo.App.E.D.2001).

Having found that the cost of repairs was the proper measure of actual damages, and there being no other error alleged as to the amount of actual damages, those damages are fixed at $650,000 on remand. *See Kibbons v. Union Electric Co.*, 823 S.W.2d 485 (Mo. banc.1992); *see also McHaffie v. Bunch*, 891 S.W.2d 822, 827–28 (Mo. banc 1995). The allocation of fault, based entirely on the direct negligence of each defendant and not challenged on appeal, is also fixed on remand at 80% to the Bank and 20% to Southern.

Having concluded that there is a submissible case against the Bank for punitive damages on the direct negligence count, the trial court is directed at the new trial to submit the issue of punitive damages against the Bank on its direct negligence. In all other respects, the trial court has discretion as to what evidence from the first trial is admissible at the new trial, as long as that evidence is consistent with this opinion—namely, that the Bank cannot be held vicariously liable for Southern's conduct and that the amount of actual damages and allocation of fault are fixed. *See Burnett*, 769 S.W.2d at 791.

### III. CONCLUSION

The judgment against the Bank for trespass is reversed. The award of punitive damages against the Bank is reversed and remanded for a new trial on that issue only, consistent with this opinion. The judgment awarding the plaintiffs their costs is reversed and remanded for reassessment in light of this opinion. The judgment in all other respects is affirmed.

WILLIAM H. CRANDALL, P.J. and SHERRI B. SULLIVAN, J. concurring.