Robert W. PARKER and Martha
Parker, Plaintiffs–Respondents,

v.

MIDWESTERN DISTRIBUTION, INC.,
Defendant–Appellant.

No. 56612.

Missouri Court of Appeals,
Eastern District,
Division Three.

Aug. 21, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 19, 1990.

Application to Transfer Denied
Nov. 20, 1990.

Russell F. Watters, Michael B. Maguire, T. Michael Ward, Brown, James & Rabbitt, P.C., St. Louis, for defendant-appellant.

Thomas C. Hullverson, Stephen H. Ringkamp, The Hullverson Law Firm, St. Louis, for plaintiffs-respondents.

SMITH, Judge.

Defendant appeals from a judgment against it for personal injuries sustained by plaintiff Robert Parker in a vehicle accident and for consortium damages sustained by Parker's wife. The judgment, based on a jury verdict, also awarded punitive damages to both husband and wife.

The accident occurred on the Poplar Street Bridge in St. Louis during the evening of January 31, 1985. Parker was an over-the-road truck driver operating an eighteen wheel tractor and trailer from Fenton, Missouri, to Springfield, Illinois. The evening was quite cold and there was a "spitting" of snow. As Parker started across the bridge he felt his brakes freeze up causing the air from his air brake system to discharge. When that happens the brakes are automatically applied and the truck stops immediately. Parker was able to get the rig to the right side of the road leaving a space between twelve and eighteen feet between his vehicle and the left side of the bridge.

Parker exited his vehicle to determine if he could repair the problem at roadside. After doing some checking he found he could not. He then observed a tractor with one or two trailers preparing to pass Parker's rig. He waived his flashlight at the driver. Parker testified that is a standard signal in the trucking industry of danger and that the driver should stop. The truck continued to approach and Parker got on his cab and pressed himself as tightly as possible against the cab. The rear wheels of the trailer caught Parker's legs dragging him along the pavement. One leg had to be amputated and severe damage was done to the other. The truck which caused the injury did not stop and has never been specifically identified.

Much of the evidence at trial involved identification of the offending vehicle as one owned and operated by defendant. Midwestern Distribution Inc. is a wholly owned subsidiary of Leaseway Transportation Corporation. Midwestern owns trailers with the name "Leaseway" on them. Midwestern does not own the tractors. They are owned by independent contractors who serve as the drivers. The tractors are then leased to Midwestern on a basis that they will exclusively haul freight designated by Midwestern. This freight is carried in Leaseway trailers. The drivers receive income from Midwestern for the utilization of their tractors and labor in hauling freight and pay off the financing for the tractors from the proceeds. Midwestern is I.C.C. certificated. The tractors utilized pursuant to these leases carry the Midwestern name and I.C.C. numbers as required by I.C.C. regulations.

■ Parker testified that as the truck was passing him he observed the tractor contained the wording "Midwest Distributors", an I.C.C. number and Fort Scott, Kansas. Midwestern is based out of Fort Scott. Parker did not know what the I.C.C. number was. He also testified he saw the words "Leaseway Transportation" on the side of the trailer. After being struck Parker observed the Leaseway logo on the back doors of the trailer. The Leaseway logo was confirmed by two persons further back in the line of traffic. Defendant presented much evidence (and has outlined that evidence in detail here) to establish that plaintiff's identification of the tractor and trailer was an afterthought for the purposes of litigation. That issue was one of fact for the jury, we are bound by the jury's finding, and it is unnecessary to further discuss the matter. We proceed, therefore, on the basis that the evidence establishes that the tractor carried Midwestern identification and I.C.C. numbers.

■ Defendant contends that plaintiffs failed to make a submissible case against it because they failed to prove that the driver of the tractor was an agent of Midwestern. This would prevent the application of respondeat superior, the only basis for defendant's liability. It relies upon *Chandler v.*

*New Moon Homes,* 418 S.W.2d 130 (Mo. banc 1967). In that case plaintiff sought to base recovery solely upon the ownership of a commercial vehicle by the defendant. The court, acknowledging a line of cases so holding, overruled that line of cases and held that proof of agency was the plaintiff's burden and that burden is not met solely by proof of ownership. The court held that in order to raise the presumption that the driver was acting within the scope of his employment i.e. was an agent, it was necessary to establish at a minimum that defendant was the owner of the vehicle and the driver was in the general employ of the owner. *Id.* [3–6].

In *Brannaker v. Transamerican Freight Lines, Inc.,* 428 S.W.2d 524 (Mo. 1968) the court dealt with the agency issue arising from a lease between an I.C.C. certificated carrier and an independent contractor driver. That case recognized that under I.C.C. regulations the lessee has full and complete control and responsibility during the term of the lease. As such the lessor-driver becomes for liability purposes the employee of the lessee. *Id.* [11]. That case, however, still imposed upon the plaintiff the burden of establishing that the driver was acting as an employee and was within the scope of his duties at the time of the accident.

In *Johnson v. Pacific Intermountain Express Co.,* 662 S.W.2d 237 (Mo. banc 1983) the court dealt again with the effect of I.C.C. regulations on the liability of a certificated carrier for negligence of a driver. In that case there was no claim and no evidence that at the time of the fatal accident the truck was on a mission for the certificated carrier, P.I.E. Liability was instead premised on the appearance of such a mission created by the failure of P.I.E. to remove its identifying sign from the vehicle following termination of an earlier lease. In upholding liability against P.I.E. that court discussed *Brannaker* and stated:

"*Brannaker* does support the proposition that the mere presence on a vehicle of a placard furnished by a carrier is not *conclusive* of the carrier's vicarious liability, but it involves two factual possibilities not here present, as follows: (1) the

carrier may have made reasonable efforts to terminate the lease and to reclaim its identifying signs; (2) the vehicle may have been used on a mission personal to the driver, not involving the hauling of freight for the benefit of the lessee carrier *or anyone else,* at the time of the accident. There is no basis in the evidence in this case for consideration of either of these theories, or any similar theories." *Id.* [10] (Emphasis supplied).

■ We cannot regard the utilization of the word "conclusive" as inadvertent. Traditionally courts have talked in terms of "presumptions" of agency arising from ownership and general employ of the driver. The term "conclusive" delineates a concept comparable to a presumption in the sense that the presumption is not absolute but is subject to being overcome by evidence to the contrary. The use of the term "conclusive" carries with it the implication at least that in the absence of evidence to the contrary mere presence on a vehicle of a placard furnished by the carrier establishes the carrier's vicarious liability, in short it creates a presumption.

This conclusion is supported by the remainder of the quote which includes two circumstances at least one of which (number 1) would require proof from the carrier. *Chandler* requires a showing of general employment by the defendant of the driver as well as ownership of the vehicle by defendant in order to trigger a presumption of agency. *Johnson* eliminates the necessity of a presently existing legal relationship between the driver and the carrier. It focuses rather on the appearance of a relationship created by the signs and placards the vehicle bears and creates the presumption from that fact alone. This presumption can be overcome by evidence that the carrier attempted unsuccessfully to destroy the appearance of a relationship. It can also be overcome by evidence that the driver was engaged in an enterprise unrelated to the apparent relationship purpose, i.e. the hauling of freight. We would assume, although not articulated in *Johnson,* that it would also be overcome by evidence that the driver was not authorized

by the owner of the vehicle to use the vehicle at all regardless of the use made of it, as for instance operation by a thief.

These conclusions are evidenced by the court's statement that "P.I.E. may be held liable for the truck driver's negligence, without regard to the continuing force of the lease, if the jury finds: (1) that a sign or identifying legend was furnished by a carrier in connection with a lease; (2) that the sign was on the truck at the time of the accident; and (3) that the truck was hauling regulated freight at the time of the accident." *Id.* [12–15].

Given the factual circumstance in the *Johnson* case that in fact no lease was actually in effect, the recognition that the strict statutory scheme imposed on authorized carriers was designed to provide a financially responsible party to stand behind any interstate trucking operation which negligently injures members of the traveling public (*Id.* ftnt. 13), and the recognition in *Brannaker* that I.C.C. regulations impose upon the lessee exclusive possession, control and use of the vehicle it is at least arguable that the third element identified in *Johnson* is not an element of the plaintiff's case if in fact a lease is in effect.

Regardless of that, we must conclude that *Johnson* has created a different level of proof than that articulated in *Chandler* and *Brannaker* where a certificated carrier is involved. The concept of "constructive agency" derived from the I.C.C. statutes and regulations and the concept that a certificated carrier's liability is premised on "appearances, not on actualities" convinces us that the tests imposed in *Chandler* and *Brannaker* are no longer applicable to certificated carriers. *Johnson, supra,* l.c. 240, 246.

We turn to the three elements identified in *Johnson*. There was evidence that trucks operated by Midwestern carried that logo and utilized trailers with the Leaseway logo. These tractors and trailers were operated under leases between Midwestern and the drivers. The identifying legends were on the tractor and trailer at the time of the accident. There was no direct evidence of the freight being hauled at the time of the accident. The accident occurred on a bridge connecting Missouri and Illinois so the interstate nature of the transport was established. There was evidence that 90% of the miles traveled by Leaseway marked trailers were with loads, full or partial. The remaining miles were "deadhead" trips, an integral part of the freight hauling operation. Trip records concerning Midwestern rigs operating in the vicinity of St. Louis at the time of the accident reflect almost entirely cargo subject to regulation. From this evidence the jury could find it was more probable than not that the rig in question was carrying regulated freight at the time of the accident. The evidence was sufficient to support the verdict.

■ Defendant challenges the verdict directing instructions submitted by plaintiffs and given by the court. We find defendant's challenges to be without merit. The alleged shortcomings involve matters which were either unnecessary, undisputed or were required to be found by the instructions given.

■ Defendant also complains of two evidentiary rulings of the court. One involves alleged hearsay. It is enough to say the information obtained from the question was elicited to prove that a statement was made not for the truth of the matter contained in the statement. As such it was not hearsay. *In Interest of A.M.K.,* 723 S.W.2d 50 (Mo.App.1986) [10–12]. The second ruling involved the sustention of an objection to a question involving Robert Parker's statement concerning his belief that the other driver did not realize he had hit Parker and therefore left the scene. This is a conclusion about another person's mental processes and intentions. It did not constitute an admission against interest of Parker. It was therefore inadmissible. *Smith v. Bocklitz,* 344 S.W.2d 97 (Mo.1961) l.c. 99.

■ Defendant next contends that the trial court erred in submitting punitive damages to the jury as to both plaintiffs. We agree. We must view the evidence in

the light most favorable to plaintiffs. *Smith v. Courter*, 575 S.W.2d 199 (Mo. App.1978) [6, 7]. However, there must exist evidence that there was conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury. *Hoover's Dairy, Inc. v. Mid–American Dairymen, Inc.*, 700 S.W.2d 426 (Mo. banc 1985) l.c. 435.

It may be conceded that plaintiff's truck presented a dangerous situation which required great care. Plaintiff testified, however, that between 12 and 18 feet of clearance existed between his truck and the left side of the road. His two eyewitnesses both testified that there was enough clearance for the unidentified truck to get through but that the accident occurred because the angle of approach was wrong. Plaintiff testified that the truck was moving between 10 to 20 miles per hour but admitted that was at best an estimate and because of his position of danger he may have believed the vehicle was moving faster than it was. The two eyewitnesses testified that traffic was moving slowly at a stop and go pace prior to the accident and that the unidentified truck "inched" around the plaintiff's vehicle. Plaintiff testified that several automobiles passed him after he was stopped and that he believed he heard a large truck go past while he was examining his vehicle before the accident. He admitted that in his deposition he stated that he saw a large tractor-trailer unit pass him after he was stopped before the unidentified trailer struck him. The conduct we must look to is not whether the passing maneuver was conducted in a negligent manner, but whether the unidentified driver knew that passing Parker's truck at all would naturally or probably result in injury to Parker. We are unable to conclude from the record that the evidence was sufficient to establish that the other driver consciously attempted to pass Parker's vehicle knowing that doing so would naturally and probably result in injury. The award of punitive damages must be reversed. We need not, therefore, discuss the issue posited by defendant of the availability of punitive damages on plaintiff wife's derivative consortium claims.

■ Finally, we deal with a question involving the verdict. The verdict returned by the jury assessed 81.1% fault to defendant, 18.9% to plaintiff and then stated Robert Parker's damages, disregarding his fault, to be "One Million Eight Hundred Eighty". The clerk read the verdict as "one million eight hundred eighty thousand dollars." Upon polling of the jury the nine jurors concurring in the verdict agreed that the verdict *as read by the clerk* was their verdict. Before accepting the verdicts the trial court stated it was unable to determine the amount of the verdict. After some considerable colloquy outside the hearing of the jury the jury was repolled on the question if its verdict was for "one million eight hundred eighty dollars." Eight of the jurors responded affirmatively, four negatively including one who had signed the verdict. The notes of the forewoman, which she had given to the court with the verdict because she felt the court should have them, reflected a "final total of $1,880,000." The court after the second poll found the verdict as to Robert Parker ambiguous, refused to accept the verdict, gave the jury MAI3d 2.06 and a new verdict form, and returned them to the jury room for further deliberation. The jury subsequently returned with a verdict of "$1,880,000.00" which the court accepted. Defendant premises the rejection of the original verdict as error.

■ To constitute a final verdict, the jury decision must be submitted to the court, accepted by it, assented to by the jury, and recorded by the court. *Welsh v. Burlington Northern Railroad Company*, 719 S.W.2d 793 (Mo.App.1986) [6, 7, 8]. If the verdict is ambiguous, inconsistent or otherwise defective the jury should be given an opportunity to correct it or find a new one before the verdict is recorded and made a part of the judgment. *Id.*

The court here found the verdict ambiguous. We find no error in that determination. The initial verdict as written was not the verdict as read yet the jury assented to the verdict as read. When the verdict as written was read only eight of the jurors assented to that. The trial court, having found an ambiguity, reinstructed the jury as provided for in MAI and returned it for further deliberations. Only after such further deliberations and a new verdict did the court accept the verdict. The trial court's procedure was correct and we find no error.

Judgment for punitive damages in favor of both plaintiffs reversed, judgment for actual damages in favor of both plaintiffs affirmed.

SATZ, P.J., and GRIMM, J., concur.