**Frank HORNER and Cherrie Horner, Respondents,**

v.

**FEDEX GROUND PACKAGE SYSTEM INC., Appellant.**

**No. WD 68043.**

Missouri Court of Appeals, Western District.

July 15, 2008.

Anthony F. Rupp, Jay Heidrick (Co-counsel), Overland Park, KS, William E. Quirk (Co-counsel), Kansas City, MO, for Appellant.

Michael S. Ketchmark, Scott A. McCreight (Co-counsel), Bradley K. Kavanaugh (Co-counsel), Kansas City, MO, for Respondents.

Before VICTOR C. HOWARD, C.J., JAMES E. WELSH, and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

## I. Introduction

On March 25, 2003, Respondent Frank Horner ("Horner") was injured in a collision between his car and a semi-truck-tractor driven by Scott Allen ("Allen"), an employee of M & C Unlimited LLC ("M & C"). At the time of the accident, M & C was under an exclusive lease agreement to provide trucking services to Appellant, FedEx Ground Package System, Inc. ("FedEx Ground"), an interstate motor carrier certified by the Department of Transportation ("DOT"). The truck-tractor bore FedEx Ground's DOT registration number and logo when it collided with Mr. Horner's vehicle.

FedEx Ground appeals from a judgment entered on a jury verdict awarding Horner and his wife, Cheri, monetary damages arising from the personal injuries Horner sustained as a result of the accident. In this appeal, FedEx Ground claims that the trial court's judgment below should be reversed on the grounds that: (1) the trial court erred in its determination that, as a matter of law, FedEx Ground is vicariously liable for Allen's operation of the injury-causing vehicle; and (2) the trial court erred in its admission of certain expert testimony, to FedEx Ground's prejudice.

For the reasons set forth below, we affirm.

## II. Analysis

### A. FedEx Ground's Vicarious Liability for Allen's Negligence.

FedEx Ground's first and second points of error are essentially the same. Both contend that the trial court erred in holding that, in light of the material undisputed facts, FedEx Ground was vicariously liable for Allen's actions as a matter of law.

FedEx Ground had multiple bites at the vicarious-liability apple in the proceedings below. FedEx Ground filed its first motion for summary judgment on the issue on December 5, 2003, claiming that, as a matter of law, it was not vicariously liable for Horner's injuries, because Allen was not acting as its agent at the time of the accident. This motion was denied on De-

cember 8, 2004. FedEx Ground then filed a second summary judgment motion on the vicarious-liability issue, which the trial court denied on June 28, 2006, and again on November 15, 2006, when it denied reconsideration.

The agency issue was raised again during the pretrial motions hearing on December 4, 2006, the first day of trial. During that hearing, the court once again heard the parties' arguments on the issue and held that, as a matter of law, Allen was acting on behalf of FedEx Ground when the collision occurred. In doing so, the trial court granted Horner's oral motion for summary judgment on the issue, which effectively also granted Horner's motion *in limine* requesting the trial court to exclude evidence as to whether Allen was acting in the course and scope of his employment. That ruling was subsequently upheld when FedEx Ground renewed its summary judgment motion as to vicarious liability both at the close of Horner's case and in its motion for judgment notwithstanding the verdict.[1]

Taking the rulings in reverse chronological order, in Point I FedEx Ground contends that the trial court erred in denying its JNOV motion based on an erroneous conclusion of law, namely, that FedEx Ground is vicariously liable for Allen's negligence. More specifically, according to FedEx Ground, under the undisputed facts Allen was not acting for its benefit at the time of the collision. In Point II, FedEx Ground contends that the trial court erred in denying its motion for summary judgment and granting summary judgment in Horner's favor on the issue of FedEx Ground's vicarious liability, and adds that the trial court's exclusion of evidence as to whether Allen was acting in the course and scope of FedEx Ground's employment was in error.

 As FedEx Ground states, the standard of review as to both points is the same. As to denials of motions for judgment notwithstanding the verdict based on a conclusion of law, our review is de novo. *Kelly v. State Farm Mut. Auto. Ins. Co.*, 218 S.W.3d 517, 521 (Mo.App. W.D.2007). A trial court's entry of summary judgment is likewise subject to *de novo* review. *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. banc 2008) (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993)).[2]

**1. ICC Regulations and Imputation of Vicarious Liability to Interstate Motor Carriers for Trucking Accidents Involving Leased Equipment**

Concerned that interstate motor carriers were attempting to immunize themselves from tort liability by leasing trucking equipment from third parties, in the 1950's the United States Congress amended the Interstate Commerce Act and authorized the Interstate Commerce Commission ("ICC") to adopt regulations governing leased equipment. *See, e.g., Roberson v. Indus. Comm'n*, 225 Ill.2d 159, 310 Ill.Dec.

1. As described in the text *infra,* we find that FedEx Ground failed to properly present on appeal any objection to the procedure by which the vicarious-liability issue was resolved. Our opinion accordingly expresses no view concerning the manner in which the issue arose and was decided.

2. Horner suggests that the trial court's ruling that FedEx Ground was vicariously liable for Allen's actions was either a granting of Horner's motion *in limine* to exclude evidence regarding the issue of agency (as to which an abuse of discretion standard applies) or a refusal to submit an agency instruction to the jury (as to which a *de novo* standard applies). In ruling on the issue, however, the trial court noted that it was "in essence granting a summary judgment for the plaintiff [sic] based on their oral request."

380, 866 N.E.2d 191, 201 (Ill.2007) (citing Act of Aug. 3, 1956, Pub.L. No. 84–957, reprinted in 1956 U.S.C.C.A.N. 1163). Recognizing the fundamental purpose of the ICC regulations, the Missouri Supreme Court noted:

> Insofar as we are immediately concerned, one of the principal abuses that developed ... was the practice whereby authorized motor carriers leased equipment from others and engaged the owners or someone for them to drive and operate the equipment as independent contractors to transport cargo for the authorized carriers. The leases were usually for a single trip or for short duration and the independent contractors were often unreliable. This practice created economic abuses and legal problems which brought on legislation and regulations designed to prevent the authorized motor carriers from delegating the performance of their franchise duties to independent contractors and from engaging in ruinous competition and evading their public responsibilities.

*Brannaker v. Transamerican Freight Lines, Inc.*, 428 S.W.2d 524, 528 (Mo.1968). Following amendments to the Interstate Commerce Act and adoption of the ICC's implementing regulations, the *Brannaker* Court explained that

[t]he legal effect of the lease arrangement was that the carrier-lessee became liable for the negligence of the owner-driver of the leased equipment to the same extent it was responsible for the negligence of one of the lessee's own drivers when operating the carrier's own equipment.

*Id.* at 534. It is against this regulatory backdrop that the issue of FedEx Ground's vicarious liability for the collision arises.

**2. Facts Relating to the Issue of FedEx Ground's Vicarious Liability**

The facts determinative of the agency issue are undisputed.[3] As a preliminary matter, the parties do not dispute the validity of FedEx Ground's lease agreement with M & C, nor that the lease complied with the ICC/DOT[4] requirements. Indeed, as required by those regulations, the lease agreement specifically provided that "RPS [now FedEx Ground][5] shall be considered to have such exclusive possession, use and control of the Equipment required by I.C.C. regulation at 49 CFR Part 1057.12(c)(1), or other applicable regulations."

M & C's hauling operations were limited exclusively to servicing FedEx Ground's business interests pursuant to the parties' lease. In fact, all of the truck-tractors owned by M & C were leased to FedEx

---

**3.** The facts recited here are taken from FedEx Ground's offer of proof on the agency issue, which included various trial exhibits, deposition testimony excerpts, and FedEx Ground's summary judgment papers.

**4.** The ICC Termination Act of 1995 abolished the ICC effective January 1, 1996, at which time the ICC's authority to regulate motor carriers was transferred to the DOT. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 759 n. 1, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (citing ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804 (1995)). "In 1999, Congress transferred responsibility for motor carrier safety within the

DOT to the newly created [Federal Motor Carrier Safety Administration or] FMCSA." *Id.* (citing Motor Carrier Safety Improvement Act of 1999, 113 Stat. 1748 (1999)). Despite these statutory changes, the relevant regulations are still called the "ICC regulations," and interstate motor carriers such as FedEx Ground are still referred to as "ICC-regulated" or "ICC-certificated" carriers.

**5.** The parties to the lease agreement are Roadway Packaging Systems ("RPS") and M & C. Following a corporate acquisition subsequent to the execution of the lease, RPS was renamed FedEx Ground.

Ground, for which M & C had hauled exclusively since M & C's incorporation. Pursuant to the terms of the lease, responsibility for maintenance of the leased equipment was delegated by FedEx Ground to M & C. M & C was required to provide equipment maintenance records on a monthly basis to FedEx Ground, which was important to ensure that the leased truck-tractors were functioning properly and in safe working condition, and in compliance with FedEx Ground's regulatory obligations.

On the day of the accident, Allen was dropped off by his wife at FedEx Ground subterminal No. 646, located in Brookfield, Missouri, where the truck-tractor had undergone maintenance work. Allen was instructed to drive the truck-tractor to FedEx Ground subterminal 641, located in Shawnee, Kansas, where, upon his arrival, he was to either pick up a load for transport (if one was available),[6] or leave the truck-tractor at the FedEx Ground Shawnee hub and return to his home. It is undisputed that at the time of the accident, no trailer was attached to the truck-tractor, such that Allen was "bobtailing" to the FedEx Ground Shawnee hub.[7] When the collision occurred, the truck-tractor bore FedEx Ground's logo and ICC registration number.

### 3. The Trial Court Did Not Err in Finding FedEx Ground Vicariously Liable as a Matter of Law

 Whether the factual circumstances warrant an imposition of vicarious liability is a question of law for the court when the material facts from which the issue is to be decided are undisputed and lead to only one reasonable conclusion. *Johnson v. Bi–State Dev. Agency,* 793 S.W.2d 864, 867 (Mo. banc 1990). That the parties' theories differ as to the legal effect of those material undisputed facts does not create a fact issue for the jury. *Kaplan v. U.S. Bank, N.A.,* 166 S.W.3d 60, 66 (Mo.App. E.D.2003). Thus, although the parties' opinions regarding FedEx Ground's vicarious liability are diametrically opposed, the issue here is how the law applies to the undisputed material facts. The trial court therefore correctly ruled that the issue is a matter of law and not one for a jury to decide.

 In granting Horner's oral motion for summary judgment on the agency issue, the trial court held that, under Missouri law, there exists an irrebuttable presumption of the ICC-certificated carrier's vicarious liability if an accident occurs while that carrier's placards are on the vehicle. Although the parties spill much ink arguing whether that was the proper test under Missouri law, for the reasons set forth below we find that the trial court did not err in finding FedEx Ground vicariously liable—even under the rebuttable presumption test FedEx Ground itself insists must be applied here, and even if the trial court was incorrect in its determination that the display of FedEx Ground's placards, standing alone, essentially imposed strict liability under Missouri law. As indicated above, this court's review of the trial court's ruling is *de novo,* "and the decision may be affirmed on different

---

**6.** Respondents claim that "[i]n this case there is no dispute that Allen was on his way to pick up a load at FedEx's Kansas Hub." At the very least, however, there is conflicting evidence on this point. As set forth in the text, even if disputed we do not find this fact material to the analysis of FedEx Ground's vicarious liability.

**7.** In trucking industry parlance, "bobtailing" describes a tractor traveling without a trailer, while "deadheading" refers to a tractor traveling with an empty trailer. If it is either bobtailing or deadheading, a truck-tractor is traveling without any freight.

grounds than those relied on by the trial court." *Neske v. City of St. Louis,* 218 S.W.3d 417, 421 (Mo. banc 2007).

Both sides rely on a handful of Missouri cases in arguing their respective (albeit contrary) positions. In doing so, the parties primarily rely on two Missouri Supreme Court cases—*Brannaker,* 428 S.W.2d 524, and *Johnson v. Pacific Intermountain Express Co.,* 662 S.W.2d 237, 244 (Mo. banc 1983)—both of which were cited by the trial court in granting summary judgment in Horner's favor.

The legal standard to be derived from these cases is somewhat unclear, making both parties' simultaneous reliance upon them understandable. On the one hand, *Brannaker* could be read as FedEx Ground contends, *i.e.,* as having adopted the minority rule that display of ICC placards creates merely a rebuttable presumption of carrier-lessee liability, requiring a traditional common-law agency analysis. The Missouri Supreme Court's later decision in *Johnson,* however, suggests that *Brannaker* is more limited. More specifically, in characterizing its earlier decision in *Brannaker,* the Supreme Court stated:

> *Brannaker* does support the proposition that the mere presence on a vehicle of a placard furnished by a carrier is not conclusive of the carrier's vicarious liability, but it involves two factual possibilities not here present, as follows: (1) the carrier may have made reasonable efforts to terminate the lease and to reclaim its identifying signs; or (2) the vehicle may have been used on a mission personal to the driver, not involving the hauling of freight for the benefit of the

lessee carrier or anyone else, at the time of the accident. There is no basis in the evidence in this case for consideration of either of these theories, or any similar theories.

*Johnson,* 662 S.W.2d at 244. In subsequently upholding the jury's verdict against the ICC-certificated carrier, the *Johnson* Court went on to state:

> The conclusion we reach is based on statutory policy rather than a conventional respondeat superior theory.... Our holding centers on the appearance of authority created and maintained when a sign is issued and not retrieved. *It was not necessary, then, for the plaintiff to show that the truck was on an actual mission for* [the ICC-certificated carrier-lessee] *at the time of the accident.* *Rodriguez v. Ager,* [705 F.2d 1229 (10th Cir.1983) ]. [The carrier-lessee]'s liability is based on appearances, not on actualities.

*Johnson,* 662 S.W.2d at 245–46 (emphasis added). The *Johnson* Court thus held the ICC-certificated carrier-lessee liable, despite the fact that the evidence was clear that the truck was *not* on a mission for the carrier at the time of the accident. *Id.* Notably, three judges—in separate opinions—dissented from the *Johnson* majority's affirmance of the verdict, arguing that the majority's holding essentially imposed strict liability upon ICC carriers (which would place Missouri squarely alongside the majority of courts espousing an irrebuttable presumption of ICC carrier liability). *Id.* at 246–48 (Higgins, J., concurring in part and dissenting in part; Donnelly, J. dissenting; Welliver, J., dissenting).[8]

---

8. The *Johnson* dissenters' conclusion is bolstered by the fact that the *Rodriguez* case, which the *Johnson* majority said is "consistent with the result we reach," is frequently cited as one of the seminal examples of the imposition of strict liability upon ICC carriers. *See, e.g.,* David N. Nissenberg, THE LAW OF COMMERCIAL TRUCKING: DAMAGES TO PERSONS AND PROPERTY § 7.16 at 406 (3d ed.2003) (citing *Rodriguez* for "the majority position" that "even when the owner-lessor is involved in an undertaking of its own at the time of the

We acknowledge that there may be some confusion as to where precisely Missouri stands on this issue, although it appears that Missouri law falls between the majority rule imposing strict liability upon ICC carrier-lessees (assuming a valid lease and displayed ICC placards) and the minority rule allowing rebuttal of the presumption as part of a general *respondeat superior* analysis. Given the manner in which it distinguishes *Brannaker, Johnson* appears to adopt the view that the display of ICC placards does not create strict ICC carrier liability. Instead, *Johnson* suggests that the presumption of vicarious liability can be rebutted, but only (1) where the ICC carrier-lessee has attempted to end the lease and reclaim its placards, or (2) where the driver has embarked upon a personal mission. *See Parker v. Midwestern Distribution, Inc.,* 797 S.W.2d 721, 723–24 (Mo.App.W.D.1990).

As was true in *Johnson,* however, "[t]here is no basis in the evidence in this case for consideration of either of these theories," 662 S.W.2d at 244, and we thus leave the resolution of whether *Johnson* in fact imposes strict liability upon ICC carriers (as the *Johnson* dissenters believed) for another day. The fact is, FedEx Ground has not offered any evidence that would operate to rebut the presumption of vicarious liability under its reading of *Johnson.* Thus, unlike FedEx Ground's counsel's hypotheticals—a driver on a personal mission to pick up furniture for his home, or driving to a restaurant for dinner—no evidence has been offered here to establish that Allen was not acting for FedEx Ground's benefit on the day of the accident. Instead, the material undisputed facts clearly establish that, as a matter of law, Allen was acting in the course and scope of his employment, for a business purpose of FedEx Ground.

More specifically, Allen was transporting the truck-tractor, following maintenance work, from a maintenance facility owned by FedEx Ground in Brookfield, Missouri, to FedEx Ground's Shawnee hub, where the truck-tractor needed to be to accept its next FedEx Ground load for transport. Such maintenance was in furtherance of FedEx Ground's business purposes, given its legal responsibility to ensure the safety of equipment used for hauling its freight over public highways, and the fact that equipment in good operating condition is needed to move FedEx Ground's freight.[9] The fact that the

accident, the carrier-lessee is responsible for the damages caused by the owner-lessor's negligence."). In fact, *Johnson* has been characterized as having made the test imposed in *Brannaker* "no longer applicable to certificated carriers." *Parker v. Midwestern Distrib., Inc.,* 797 S.W.2d 721, 724 (Mo.App. E.D.1990) (citing *Johnson,* 662 S.W.2d at 240, 246).

9. FedEx Ground's reliance on *Sharp v. W. & W. Trucking Co.,* 421 S.W.2d 213 (Mo. banc 1967) is misplaced. As a preliminary matter, that case does not involve an ICC-certificated carrier-lessee. Second, in that case the Court found that there was not even an equipment lease in effect, such that the trucking company had no legal interest whatsoever in the equipment involved in the accident. *Id.* at 218 ("There is not the slightest evidence that W. & W. had a lease on the trucks," and thus "[t]here is no proof that W. & W. had any possessory or other property interest in the [truck owner's] trucks."). Certainly, no lease was in effect requiring a carrier-lessee to assume "exclusive possession, use and control" of the truck at issue. Finally, in *Sharp* the accident occurred while the truck owner was on his way from home to the workplace, which implicated the general rule " 'that getting to the place of work is ordinarily a personal problem of the employee,' " such that it is generally outside the course and scope of employment. *Id.* at 219 (quoting 8 Am.Jur. 2d Automobiles and Highway Traffic § 630, at 184). In our case, Allen was not commuting between his home and workplace at the time of the accident.

truck-tractor was bobtailing at the time of the collision does not alter this conclusion. Indeed, in a case involving strikingly similar facts, the Eighth Circuit, applying Oregon *respondeat superior* principles, found that the driver of a bobtailing truck-tractor that was between dispatch orders but on its way for scheduled maintenance was clearly acting in the ICC carrier-lessee's business at the time of the accident. *Nat'l Cont'l Ins. Co. v. Empire Fire & Marine Ins. Co.*, 157 F.3d 610, 612–13 (8th Cir. 1998).[10]

The fact of the matter is that, in order to be available to haul freight for FedEx Ground from the Shawnee hub, the truck-tractor had to be driven from the maintenance facility to the Shawnee terminal. That activity—even while no freight was being transported—is clearly essential to FedEx Ground's business. *Parker,* 797 S.W.2d at 724 (recognizing deadhead trips as "an integral part of the freight hauling operation"); *Duke v. Thomas,* 343 S.W.2d 656, 657–58 (Mo.App.1961) (carrier-lessee vicariously liable for accident which occurred while driver "deadheading" on return trip after dropping off load).

■ Moreover, equipment maintenance constitutes a business function of FedEx Ground just as it would be if FedEx Ground owned the truck-tractor as opposed to leasing it. *Empire Fire & Marine Ins. Co. v. Ins. Co. of Pa.,* 638 So.2d 102, 104 (Fla.App.1994) ("The oil change is a maintenance function which is a part of

the trucker's business, just as it would be if the truck-tractor had been owned by the I.C.C. carrier."). Not only does the leased equipment have to be in working order to be physically capable of hauling FedEx Ground's freight, but an ICC carrier-lessee cannot, by simply assigning to the owner-lessor the tasks of maintenance and repair, escape liability for exposing the public to non-roadworthy equipment:

> [T]he procurement of repairs incident to lessor's duty to hold the tractor "ready at all times for services of the lessee" is to be regarded as an activity exclusively in the business of the lessee and not a personal use of the tractor by [the owner-lessor].
>
> Moreover, [the ICC-carrier]'s duty to maintain the tractor "in safe and proper operating condition" while it was subject to its control is not a duty which may be delegated to the lessee with the effect of removing its performance from the sphere of [the ICC-carrier]'s business activities.

*Freed v. Travelers,* 300 F.2d 395, 398 (7th Cir.1962) (footnote omitted). Thus, the fact that M & C was responsible for maintenance does not mean that Allen was somehow serving *only* M & C's interests at the time of the accident; indeed, " 'the possibility that the owner's interests coincided with those of the lessee does not diminish the benefits the lessee received from the owner's actions.' " *Nat'l Cont'l,* 157 F.3d at 613 (quoting *Hartford Ins. Co.*

**10.** As was the case in *National Continental,* the issue of whether a driver is acting in the business of an ICC-certificated carrier-lessee often arises in insurance actions, in which disputes arise as to which policy of insurance applies: the carrier-lessee's coverage, or instead the owner-lessor's policy (which typically excludes coverage when leased equipment is being used to service a carrier-lessee). Such cases frequently observe that the issue of the carrier-lessee's vicarious *liability* to a

tort victim is distinct from the insurance coverage question. *See, e.g., Hartford Ins. Co. v. Occidental Fire & Cas. Co.,* 908 F.2d 235, 239 (7th Cir.1990). We nevertheless believe that insurance-coverage decisions like *National Continental* are instructive to the extent they address whether a particular driver's actions at the time of an accident were being conducted in furtherance of a carrier-lessee's business objectives.

*v. Occidental Fire & Cas. Co.*, 908 F.2d 235, 239 (7th Cir.1990) (alterations omitted)).[11]

Allen was clearly acting for a business purpose of FedEx Ground at the time of the collision. Allen[12] was driving the truck-tractor to the Shawnee hub from the facility where maintenance had been performed. The only evidence in the record conclusively establishes that the truck-tractor, which was under lease to FedEx Ground, was used exclusively for FedEx Ground's business.[13] Given that Allen was driving the truck-tractor to the Shawnee FedEx Ground hub *where it is undisputed the truck-tractor needed to be* to be available for and to accept the next FedEx Ground load (whenever that load was ready), he was clearly acting for a business purpose of FedEx Ground.[14] And while it is true that Allen's act of delivering the tractor from FedEx Ground's Brookfield maintenance terminal to FedEx Ground's Shawnee hub may have been to the mutual benefit of M & C and FedEx Ground, there is no question that FedEx Ground's business purposes were being served. *Nat'l Cont'l*, 157 F.3d at 613.[15]

---

11. We recognize that two Alabama cases cited by FedEx Ground, *T.J. Cox v. Howard Hall Co.*, 289 Ala. 35, 265 So.2d 580 (1972), and *Thomas v. Hubbert*, 280 Ala. 302, 193 So.2d 746 (1966), could be read to warrant a different result that the one we reach here.

12. The fact that M & C, as the owner-lessor, employed Allen to drive the truck-tractor does not add another layer of analysis to the issue. Vis-à-vis the public, FedEx Ground is liable for the negligence of the driver—no matter whether the driver is actually the owner-lessor or simply an employee thereof—as if the driver were FedEx Ground's own employee. *Brannaker*, 428 S.W.2d at 528 ("The legislative intention was to put the use and operation of leased vehicles on a parity with equipment owned by the authorized carrier and operated by its own employees."); *see also, e.g., Johnson*, 662 S.W.2d at 239, 245–46 (ICC-certificated carrier liable; driver was not owner-lessor himself, but someone from whom the owner-lessor secured driving services).

13. Consequently, this case is much less complicated than other cases in which a so-called "trip lease" is involved. In those cases, there is yet another possible defendant—the trip lessee—and therefore another level of inquiry may be required, *i.e.,* a determination of whether the driver is acting on behalf of the original ICC carrier-lessee or the trip lessee.

14. FedEx Ground cites *Usrey v. Dr. Pepper Bottling Co.*, 385 S.W.2d 335, 338 (Mo.App. 1964), for the proposition that Allen's delivery of the truck-tractor and making his services available are insufficient to impose vicarious liability upon FedEx Ground. But in *Usrey*, the employer (which was not noted to have been an ICC-carrier) had arranged for a driver's return transportation to his home following the delivery of a cargo load. *Id.* at 336. Rather than relying on the employer's arrangement for return transportation, the driver instead had his wife follow him to the place of delivery, where she was to pick him up and drive him to social engagements elsewhere. *Id.* at 339. While following her husband in the family car, the driver's wife collided with another vehicle. *Id.* at 337. The question in *Usrey* was thus whether *the driver's wife* was acting as an agent for the employer at the time of accident. The court held that she was not, since "[s]he was driving there for the purpose of accomplishing a personal end entirely unrelated to the business of the employer—i.e., that of driving with her husband and family to [two other locations for social visits before returning home]." *Id.* at 339. Thus, unlike here, the evidence in *Usrey* was that the driver's wife's trip did not to serve *any* business purpose of the employer.

15. The fact that Allen was furthering FedEx Ground's business purposes, and not engaged in a purely personal mission, would also satisfy a third element of liability established by *Johnson* (a case in which the equipment lease had terminated): that the plaintiff prove that "the truck was hauling regulated freight at the time of the accident," or "was being operated in some other way which would facilitate the movement of non-exempt freight." *Johnson*, 662 S.W.2d at 245 & n. 19. We share the Eastern District's doubts that this third element even applies where an exclusive lease

Because the material undisputed facts establish FedEx Ground's vicarious liability as a matter of law, FedEx Ground's insistence that it was entitled to present evidence to the jury as to whether Allen was acting within the course and scope of his employment is without merit. Indeed, as the trial court put it, "everybody is agreeing where [Allen] was going and why he was going there"; "[t]he only disagreement seems to be on how the law applies to that." All that was left, then, was the legal question of whether the material undisputed facts established that Allen was acting for a business purpose of FedEx Ground at the time of the collision. Again, the fact that FedEx Ground disputes the manner in which the law applies to the facts does not mean that it is entitled to present evidence to the jury.[16]

The cases cited by FedEx Ground as allegedly entitling it to present evidence to the jury do not require a contrary result. For instance, while *Kaplan Trucking Co.*

*v. Lavine*, 253 F.2d 254 (6th Cir.1958), found a jury question whether a driver was acting in the course and scope of his employment, it was because the facts there were far from undisputed. In *Kaplan*, the driver hauled a load for the ICC-carrier from Pittsburgh, Pennsylvania, to Columbus, Ohio, where he dropped the load off. *Id.* at 257. Instead of returning to the ICC-carrier's home terminal in Pittsburgh, the driver drove to Mansfield, Ohio, where he entered into a trip lease with a third party to transport a load to Buffalo, New York. *Id.* The driver then began traveling from Buffalo to Pittsburgh, at which time the accident occurred. *Id.* The parties disputed whether, at the time of the accident, the driver was returning to the ICC-certificated carrier's home terminal, or whether the driver's "intention was to return home to his home for the New Year's holiday ... so that the return journey served only his personal interest." *Id.*

In holding that that issue was "clearly one for the jury," the *Kaplan* court cited—

---

arrangement remains in effect. *See Parker*, 797 S.W.2d at 724. *Robertson v. Cameron Mut. Ins. Co.*, 855 S.W.2d 442, 449–50 (Mo. App. W.D.1993), is not to the contrary: in *Robertson*, as in *Johnson*, the specific truck allegedly causing an accident was never identified, and thus it could obviously not be determined whether a lease arrangement was in effect at the relevant time.

FedEx Ground also relies on the ICC's 1986 and 1992 revisions to its rules (found at 49 C.F.R. Part 1057) to argue that generally applicable *respondeat superior* principles must be applied. However, *Parker* and *Robertson* continued to apply principles gleaned from the Supreme Court's decisions in *Johnson* and *Brannaker* subsequent to the 1986 amendments, and we find that those amendments (addressing termination of leases and the removal and return of placards on lease termination) do not affect our analysis here. The 1992 revision, which added 49 C.F.R. § 1057.12(c)(4), merely states that the ICC's lease requirements do not affect whether a driver "is an independent contractor or an employee of the authorized carrier lessee."

The ICC's order makes clear that this revision was intended to address a driver's *employment status*, particularly in workers' compensation proceedings. *Ex Parte No. MC–203, Petition to Amend Lease & Interchange of Vehicle Regulations*, 8 I.C.C.2d 669, 670–71 (1992). Notably, the ICC eliminated a reference to its rules' effect on "agency relationships" from the final rule, finding that the phrase was unnecessary "to accomplish the stated objectives." *Id.* at 671.

16. Notably, in its second motion for summary judgment FedEx Ground stated:

[A]s was discussed at the pretrial conference on March 6, this is an issue which comes to the court on facts which are not in dispute. The issue of whether FedEx Ground may be vicariously liable under these facts is one that involves a legal issue rather than a factual one.

FedEx Ground does not explain why the issue is now no longer one of law, and—despite multiple opportunities—has not identified any disputed facts which would materially affect the result.

and distinguished—*Marriott v. National Mutual Casualty Co.*, 195 F.2d 462 (10th Cir.1952). As *Kaplan* noted, in *Marriott* the Tenth Circuit held, *as a matter of law*, that, "upon the completion of [a] trip lease the driver had resumed the course of its regular employment with the permanent [ICC carrier-]lessee," and thus that the permanent lessee was liable for an accident which occurred while the driver was returning with an empty trailer to the carrier-lessee's terminal. *Kaplan*, 253 F.2d at 258 (citing *Marriott*, 195 F.2d at 466). The *Kaplan* court explained that, *unlike* the case before it,

> in the *Marriott* case there was no suggestion that after the termination of the trip lease the driver was on a personal mission of his own, such as the contention here that [the driver] was going to his home in Pittsburgh for the holidays, rather than to [the ICC carrier-lessee]'s terminal.

*Id.* (citing *Marriott*, 195 F.2d at 466). It was because of that material fact dispute that the *Kaplan* court held the issue was one for the jury to decide. Here, however, unlike *Kaplan* (and similar to *Marriott*), there is absolutely no suggestion that Allen was on a personal mission or had otherwise departed the scope and course of his employment when he was driving from the Brookfield FedEx Ground maintenance facility to the FedEx Ground Shawnee hub.

In its reply brief, FedEx Ground for the first time appears to take issue with the fact that Horner did not file a written cross-motion for summary judgment on the agency issue. FedEx Ground's opening brief—and in particular its Points Relied On—did not argue any alleged procedural error in the trial court's grant of Horner's oral motion for summary judgment, instead arguing whether the undisputed facts in fact supported · the trial court's ruling. The issue of whether a written summary judgment motion was required is not properly raised on reply. *See, e.g., Williams v. Fin. Plaza, Inc.*, 78 S.W.3d 175, 181–82 (Mo.App. W.D.2002).[17]

## B. Whether the Trial Court Erred in the Admission of Expert Opinion Testimony Addressing the "Barona Formula"

In Point III of its appeal, FedEx Ground argues that the trial court abused its discretion in admitting the testimony of plaintiff's expert, Dr. Blansett, and in particular his reliance on the "Barona formula" to estimate Horner's pre-accident intelligence quotient ("IQ"). FedEx Ground argues that the Barona formula is racially, socio-economically, and gender biased.

FedEx Ground's Point III is denied. First, and as explained below, the Barona formula was not the "sole basis for key conclusions" of Dr. Blansett's testimo-

---

17. Even if any procedural objections had been properly preserved, it appears that FedEx Ground's complaint concerns whether the facts offered by Horner in opposition to FedEx Ground's second summary judgment motion are appropriately considered here. Because we have relied only on the facts offered by FedEx Ground, *see supra* note 3, however, any complaint regarding additional facts Horner offered in opposition to FedEx Ground's summary judgment papers is moot. Moreover, given that FedEx Ground submitted an offer of proof at the conclusion of trial which identified no further disputed facts which would alter the outcome, any procedural error in the manner in which the issue was resolved would not merit reversal. Rule 84.13(b). FedEx Ground had ample opportunity to present whatever facts support its theory that Allen was not acting for a business purpose of FedEx Ground at the time of the accident (such that imposition of vicarious liability would be inappropriate), but has failed to present any material, disputed facts which would require reversal of the trial court's ruling.

ny, but was instead only a minor consideration in his overall assessment of Horner's condition. More fundamentally, however, even if the trial court erred in admitting Dr. Blansett's testimony, it was at most harmless error under Rule 84.13(b). That rule provides that this Court shall not reverse any judgment unless we find that the alleged trial court error materially affected the merits of the action. *Id.; see, e.g., Burns v. Elk River Ambulance, Inc.,* 55 S.W.3d 466, 480 (Mo.App. S.D.2001) (appellant failed to show alleged error in admission of expert testimony materially affected outcome of case).[18]

Contrary to FedEx Ground's assertions, the record establishes that Dr. Blansett did not rely heavily upon the Barona formula in reaching his conclusion that Horner suffered a decrease in cognitive functioning as a result of the accident. Instead, Dr. Blansett's opinion testimony was based upon his review of numerous sources of information, including Horner's medical, educational and military records; a clinical interview with Horner and his wife; and the analysis of a set of over twenty standard neuropsychological tests administered by Dr. Blansett to Horner. Indeed, Dr. Blansett specifically testified that the Barona formula was "one thing that I considered, *a very minor part in my consideration.*" (Emphasis added.)

Dr. Blansett's trial testimony confirms that the results of the entire battery of tests—much less the Barona formula in particular—were not the centerpiece of his assessment of Horner:

---

**18.** Horner argues—with some force—that FedEx Ground failed to properly preserve its objection to Dr. Blansett's reliance on the Barona formula at trial, and that the issue should accordingly be reviewed under the highly deferential "plain error" standard.

Q: And as part of your evaluation of Mr. Horner, what was—what kind of stood out to you as the most significant as part of your overall analysis?

A. Well, it was the whole picture. I mean, the whole picture. You look at what an individual has been through medically. You look at the fact that the individual was initially amnesic for the event, which means they don't remember it. You look at the fact that he was diagnosed with a closed head trauma.

You look at the fact that he had some pretty wobbly contusions for the front part of his face. And then you look at the difficulties that somebody presents to you, and you look at the context of maybe what somebody else says about them. Like in this case, his wife of 20 years. And then you look at your test results.

He further testified that "doing an assessment like I do a lot of is like putting together a puzzle. You got to have all of these different pieces," which, in Horner's case, included the available medical and other records, the clinical interview (of both Horner and his wife), and the results of the battery of tests administered by Dr. Blansett to Horner.

As part of his assessment, Dr. Blansett attempted to determine Horner's pre-accident or "premorbid" intellectual functioning, which "basically means trying to make some attempt as to what somebody was like beforehand." To do so, Dr. Blansett testified:

While a close question, we need not resolve this issue, given our conclusion that—even if fully preserved—FedEx Ground has failed to show reversible error in the admission of his testimony as required by Rule 84.13(b).

Well, you look at any available records that, you know, potentially medical records before the accident if you've got them. And you look at any kind of scholastic records before the accident, if you've got them. You look at an individual's functioning throughout their life; you know, whether or not they've been able to hold down a job, have a stable marriage—

In this case, in addition to medical and educational records, Dr. Blansett also looked at Horner's military records.

In attempting to determine Horner's pre-accident functioning, Dr. Blansett considered the Barona formula only because he believed that the results of IQ tests taken by Horner over thirty years earlier while in high school, which fixed his full-scale IQ at 68, were inconsistent with the manner in which Horner was living and conducting his life prior to the accident.[19] According to Dr. Blansett:

Full scale score of 68 puts—I mean, that's basically the same range as a 63, which places someone within the mild range of mental deficiency.

Thus, in Dr. Blansett's own words:

It was my decision to [apply the Barona formula] based on the IQ tests premorbidly, which again is a term I don't like using, and felt really underestimated Mr. Horner's abilities given current testing and the way this man has lived his life. So I added that as just another piece of the puzzle.

And the only reason I applied [the Barona formula] is because there was a

disparity between the premorbid stuff that was from his school records and what I found, and a disparity between Mr. Horner's functioning in life, which was being gainfully employed, being independent, taking care of his own self care needs, living as a fully functioning independent individual. And if he had had an IQ of 63, you would expect this guy to be working in a workshop somewhere and that wasn't the case.

In fact, Dr. Blansett placed minimal reliance on the actual results of the application of the Barona formula in Horner's case, and adjusted Horner's pre-accident IQ score (as predicted by the Barona formula) downward by at least one standard deviation, so as to be consistent with his impression of Horner's likely pre-accident IQ as reflected by available records and his clinical interview of Horner and his wife. In so doing, Dr. Blansett estimated Horner's pre-accident IQ score at approximately 85, which was only three points above his post-accident IQ test results.[20] Thus, Dr. Blansett did not use the Barona formula to estimate that Horner's pre-accident IQ was exceptionally higher than what his post-accident testing revealed, and then rely on that discrepancy as the sole or primary basis to establish a loss of cognitive functioning. Instead, all that Dr. Blansett's application of the Barona formula did was to confirm what he believed based on the results of the tests he administered to Horner and his understanding of Horner's pre-accident cognitive functioning (gleaned from his review of various records and his clinical interview of Horner

---

**19.** These earlier tests employed the Lorge–Thorndike IQ test, which Dr. Blansett characterized as an "old IQ test," as opposed to the "modern" Stanford–Binet IQ test.

**20.** FedEx Ground's briefing repeatedly states that Dr. Blansett determined that Horner's pre-accident IQ was 98.58. We find these

references misleading. In fact, while Dr. Blansett's original calculations indicated that Horner's pre-accident IQ would have been 98.58, to be conservative he discounted that value by one standard deviation, thereby estimating Horner's pre-accident IQ at 85, *not* almost 100 as FedEx Ground claims.

and his wife): that Horner's thirty-year-old IQ test results from high school were inconsistent with Horner's level of pre-accident cognitive functionality.[21]

Despite FedEx Ground's claims to the contrary, nothing in the record indicates that the jury's damages award was based entirely or even largely upon Dr. Blansett's testimony relating to the Barona formula. Dr. Blansett himself minimized the value of the Barona formula, testifying that it has been criticized for being "very culturally biased," that it is a formula "which I really don't like," and acknowledging its significant flaws. According to Dr. Blansett, "[t]hat is precisely why you cannot rely on this as a quote/unquote test." Contrary to FedEx Ground's suggestion that the Barona formula was the major theme of Dr. Blansett's assessment, almost all of Dr. Blansett's testimony relating to the Barona formula was actually elicited during cross-examination at FedEx Ground's counsel's urging. And the fact that Dr. Blansett made clear the universal criticisms and his own obvious discomfort with the Barona formula further undercuts—if not eviscerates—FedEx Ground's claim that it was somehow prejudiced by any testimony about it. Indeed, given that Dr. Blansett roundly criticized the Barona formula (and IQ tests in general) in front of the jury, we find FedEx Ground's claim that his reliance upon it was absolutely integral to his overall assessment of Horner's condition—or to the jury's damage award—unpersuasive.[22]

In addition, there was ample evidence in the record from which the jury could have determined that Horner suffered significant injuries. In fact, in addition to his head injury, Horner suffered extensive injuries to his right leg, which still caused him pain and forced him to walk with a cane, as well as depression (which was either caused by the accident itself (according to Horner's experts), or related to his leg injury (according to FedEx Ground's expert)). In addition to Dr. Blansett, four other experts testified on Horner's behalf as to the nature and extent his injuries, including a board-certified neurologist, an economist, an orthopedic surgeon and a vocational rehabilitation counselor. The jury also heard from Horner's family, friends and co-workers, as well as from the medical personnel responsible for Horner's treatment, all of whom supported Horner's damages theory.[23]

Having been such an inconsequential part of Dr. Blansett's testimony, there is simply no basis to conclude that FedEx Ground was prejudiced by Dr. Blansett's

---

**21.** Notably, Dr. Blansett himself testified, in agreement with FedEx Ground's expert, that "a drop in IQ isn't necessary in order to diagnose somebody as having had some kind of mild traumatic brain injury." Given that all that Dr. Blansett's application of the Barona formula did was place Horner's predicted pre-accident IQ at three points higher than his post-accident IQ, Dr. Blansett's testimony did not place much (if *any*) significance on IQ scores as the basis for his opinion that Horner suffered a loss of cognitive functioning as a result of the accident.

**22.** FedEx Ground claims that the alleged error was "compounded" because the testimony of two of Horner's other expert witnesses was allegedly tainted by Dr. Blansett's use of

the Barona formula. As a preliminary matter, although it raised the issue in its opening brief as to Dr. Horowitz, it was not until its reply that FedEx Ground raised any argument that Dr. Titterton also relied on Dr. Blansett's use of the Barona formula (and then failed to provide a record citation to support that assertion). In any event, a review of both Dr. Horowitz's and Dr. Titterton's testimony shows that it was not based in any significant part on Dr. Blansett's report, much less his use of the Barona formula in particular.

**23.** FedEx Ground does not separately challenge the amount of the jury's award, and we accordingly express no views on that issue.

use of the Barona formula as part of his overall assessment of Horner, much less that FedEx Ground suffered the type of material prejudice required by Rule 84.13(b) to warrant reversal.[24]

The judgment is affirmed.

All concur.

**24.** Because we find that FedEx Ground has failed to show sufficient prejudice to merit a new trial even if admission of certain portions of Dr. Blansett's testimony was erroneous, we express no opinion here as to the admissibility of expert testimony based on the Barona formula.